165 F.3d 692
 99 Cal. Daily Op. Serv. 414, 99 Daily Journal
D.A.R. 1005,
99 Daily Journal D.A.R. 506,
99 Daily Journal D.A.R. 611
Kevin THOMAS and Joyce Baker, Plaintiffs-Appellees,
v.
ANCHORAGE EQUAL RIGHTS COMMISSION and the Municipality of
Anchorage, Defendants-Appellants,
and
Paula Haley in her official capacity as the Executive
Director of the Alaska State Commission for Human
Rights, Defendant.
Kevin Thomas and Joyce Baker, Plaintiffs-Appellees,
v.
Anchorage Equal Rights Commission and the Municipality of
Anchorage, Defendants,
and
Paula Haley in her official capacity as the Executive
Director of the Alaska State Commission for Human
Rights, Defendant-Appellant.
 Nos. 97-35220, 97-35221.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted July 13, 1998.
Decided Jan. 14, 1999.
 
 Cliff John Groh (argued), Assistant Municipal Attorney, Anchorage Equal Rights Commission, Anchorage, Alaska; Robert A. Royce (argued), Assistant Attorney General, Department of Law, Anchorage, Alaska, for the defendants-appellants.
 Kevin G. Clarkson (argued), Brena, Bell & Clarkson, Anchorage, Alaska, for the plaintiffs-appellees.
 Caroline M. Brown, Covington & Burling, Washington, D.C.; John P. Relman, Washington Lawyer's Committee for Civil Rights & Urban Affairs, Washington, D.C., for the National Fair Housing Alliance amicus curiae.
 Steven T. McFarland, Center for Law & Religious Freedom, Annandale, VA, for the Christian Legal Society, National Council of Churches, Union of Orthodox Jewish Congregations, Church of Jesus Christ of Latter-Day Saints, National Association of Evangelicals, and Ethics and Religious Liberty Commission amici curiae.
 Steven K. Green, Washington, D.C., for the Americans United for Separation of Church and State amicus curiae.
 Mark H. Wittow, Preston Gates & Ellis, Anchorage, AK, for the Alaska Civil liberties Union amicus curiae.
 Clyde J. Wadsworth, Heller Ehrman White & McAuliffe, San Francisco, CA, for the Lambda Legal Defense and Education Fund amicus curiae.
 Michael P. Seng, Chicago, IL, for the John Marshall Law School Fair Housing Legal Clinic amicus curiae.
 Robert J. Barth, Oak Brook, IL, for the Institute in Basic Life Principles amicus curiae.
 Appeals from the United States District Court for the District of Alaska; H. Russel Holland, District Judge, presiding. D.C. No. CV-95-0274-HRH and CV-95-0275-HRH.
 Before: FARRIS, O'SCANNLAIN and HAWKINS, Circuit Judges.
 O'SCANNLAIN, Circuit Judge:
 
 
 1
 We must decide whether the enforcement of Alaska housing laws prohibiting apartment owners from refusing to rent to unmarried couples infringes Christian landlords' rights under the Free Exercise Clause of the First Amendment.
 
 
 2
 * Kevin Thomas and Joyce Baker are owners of residential rental properties in Anchorage, Alaska.[1] Thomas and Baker, as it turns out, are also professed Christians who believe that cohabitation between unmarried individuals constitutes the sin of fornication and that facilitating cohabitation in any way is tantamount to facilitating sin. That Thomas and Baker's beliefs regarding fornication are firmly rooted both in Biblical text[2] and in the commentaries of respected Christian theologians is not disputed by the parties.[3] Thomas and Baker have committed themselves to practicing their faith in all aspects of their lives, including their commercial activities as landlords. As a result, although they willingly rent to persons of any race, persons of either gender, single persons, and separated or widowed persons, they refuse to rent to unmarried persons who plan to live together.
 
 
 3
 Both the State of Alaska and the City of Anchorage have adopted laws aimed at preventing discrimination in rental housing. Among its provisions, the Alaska statute makes it unlawful "to refuse to sell, lease, or rent ... real property to a person because of ... marital status." Alaska Stat. § 18.80.240(1). The Anchorage ordinance is in all material respects identical. See Anchorage Mun.Code § 5.20.020(A) ("[I]t is unlawful ... to ... [r]efuse to sell, lease or rent ... real property to a person because of ... marital status."). Under Alaska law, discrimination on the basis of "marital status" includes discrimination against unmarried couples. See Foreman v. Anchorage Equal Rights Comm'n, 779 P.2d 1199, 1202 (Alaska 1989). There is no dispute that Thomas and Baker have previously declined to rent to unmarried cohabitants. Nor is there any question that they have vowed to continue to decline to rent to unmarried couples. Consequently, it is clear that Thomas and Baker's conduct fits squarely within the terms of the Alaska antidiscrimination laws. The only question before us is whether or not those laws may validly be enforced against Thomas and Baker as a matter of constitutional law.
 
 
 4
 Thomas and Baker filed suit in federal district court against Paula Haley (the Executive Director of the Alaska State Commission on Human Rights), the Anchorage Equal Rights Commission ("AERC"), and the Municipality of Anchorage, seeking prospective declaratory and injunctive relief pursuant to 42 U.S.C. § 1983 and 28 U.S.C. § 2201. The landlords claimed that any enforcement of the antidiscrimination laws against them would violate their constitutional rights under the Free Exercise Clause of the First Amendment.[4] On cross-motions for summary judgment, the district court concluded, as an initial matter, that Thomas and Baker had standing, that their claims were ripe for review, and that the Eleventh Amendment did not preclude the landlord's complaint against Haley. In a separate order, the court declared that the application of the antidiscrimination laws to Thomas and Baker would violate their rights under the Free Exercise Clause and therefore permanently enjoined both the State and the City from enforcing the laws against the landlords. This appeal ensued.
 
 II
 
 5
 Initially, we must determine whether Thomas and Baker's claims are ripe for review. Neither Thomas nor Baker has yet been prosecuted; their suits are of the pre-enforcement variety. In the district court, the landlords sought a declaratory judgment and an injunction "prohibit[ing] the Appellants from acting to enforce Alaska and Anchorage anti-marital status discrimination laws against them or similarly situated landlords." The Declaratory Judgment Act, 28 U.S.C. § 2201, which authorizes anticipatory suits in some instances, does not relax or otherwise alter the requirement that a case be "ripe" for judicial review. See Aetna Life Ins. Co. v. Haworth, 300 U.S. 227, 240, 57 S.Ct. 461, 81 L.Ed. 617 (1937). In fact, § 2201 itself calls for "a case of actual controversy." Consequently, we must satisfy ourselves that "there is a substantial controversy ... of sufficient immediacy and reality to warrant the issuance of the declaratory judgment." Lake Carriers' Ass'n v. MacMullan, 406 U.S. 498, 506, 92 S.Ct. 1749, 32 L.Ed.2d 257 (1972) (quoting Maryland Cas. Co. v. Pacific Coal & Oil Co., 312 U.S. 270, 273, 61 S.Ct. 510, 85 L.Ed. 826 (1941)).
 
 
 6
 The ripeness inquiry "focuses on whether there is sufficient injury [or threat of injury], and thus is closely tied to the standing requirement." Portman v. County of Santa Clara, 995 F.2d 898, 902-03 (9th Cir.1993). Under standing doctrine, because Thomas and Baker are not presently subject to prosecution, they must demonstrate a "reasonable threat of prosecution for conduct allegedly protected by the Constitution." Ohio Civil Rights Comm'n v. Dayton Christian Schs., Inc., 477 U.S. 619, 625 n. 1, 106 S.Ct. 2718, 91 L.Ed.2d 512 (1986) (emphasis added). The Supreme Court has alternately articulated this requirement for justiciability as consideration of whether the fear of prosecution or the alleged threats of prosecution are "not imaginary or wholly speculative." See Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289, 302, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979); see also Steffel v. Thompson, 415 U.S. 452, 459, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974) (considering whether the alleged threats of prosecution "cannot be characterized as 'imaginary or speculative' "). The "reasonable threat" standards used in evaluating standing are equally applicable in determining ripeness. See Adult Video Ass'n v. Barr, 960 F.2d 781, 786 (9th Cir.1992), vacated sub nom., 509 U.S. 917, 113 S.Ct. 3028, 125 L.Ed.2d 716 (1993), reinstated in relevant part, 41 F.3d 503 (9th Cir.1994).
 
 
 7
 We look to several factors in determining whether a "reasonable threat" of prosecution exists. For instance, this court has deemed it significant whether plaintiffs have articulated "concrete plans to violate" the acts they challenge. See San Diego County Gun Rights Comm. v. Reno, 98 F.3d 1121, 1126-27 (9th Cir.1996). Thomas and Baker clearly have done so. Both admitted that they have refused in the past, and will continue to refuse in the future, to rent to unmarried cohabitants in violation of the Alaska housing laws. Courts have also pointed to the existence of past prosecutions under the challenged laws as corroborative evidence of a "reasonable threat." See id. at 1128. Here, the laws at issue have been enforced in the recent past against similarly situated landlords. See, e.g., Swanner v. Anchorage Equal Rights Comm'n, 874 P.2d 274 (Alaska 1994); Foreman, 779 P.2d 1199. Indeed, the Alaska State Commission on Human Rights is presently engaged in an anti-marital-status discrimination enforcement proceeding against Alaska Pacific University. See Alaska State Comm'n on Human Rights v. Alaska Pacific Univ., ASCHR No. C-96-010 (Complaint Served Feb. 3, 1997).[5] Moreover, as the district court observed in finding this case ripe for judicial review, the state statute has been interpreted by the Alaska Supreme Court as mandating affirmative action on the part of the state human rights commission to discover and root out all vestiges of housing discrimination. See Hotel, Motel, Restaurant, Construction Camp Employees & Bartenders Union v. Thomas, 551 P.2d 942, 945 (Alaska 1976) ("[T]he legislature intended the Commission to be more than a simple complaint-taking bureau; the statutory scheme constitutes a mandate to the agency to seek out and eradicate discrimination in ... the sale, lease, or rental, of real property.").
 
 
 8
 We have also analyzed the justiciability of claims like those of Thomas and Baker by considering whether the laws in question have fallen into desuetude or should be considered dead letter. In San Francisco County Democratic Cent. Com. v. Eu, we concluded that claims may be justiciable, notwithstanding a record of non-enforcement of the laws in question, if the record does not show that the laws in question are dead letter or have been "commonly and notoriously" violated. See 826 F.2d 814, 821-22 (9th Cir.1987) (citing Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289, 302-03, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979)). Here, the recent enforcement of the anti-discrimination laws (as noted above) demonstrates that these laws are not dead letter, nor is there any indication in the record that these laws are so "commonly and notoriously" violated as to render them dead letter, Thomas and Baker's violations notwithstanding. Moreover, if this court in Eu concluded that claims were justiciable where the law in question had never been enforced, see 826 F.2d at 821-22, we are hard pressed to see how Thomas and Baker's claims would not be justiciable where the laws in question have been and are presently being enforced.
 
 
 9
 Adult Video Ass'n is instructive on this point. There, we considered a challenge to provisions of the RICO statute allowing for pre-trial seizures. See 960 F.2d at 785. Nothing in the record indicated that the Department of Justice had ever conducted such seizures, but we concluded that the challenge was justiciable because the statute authorized such seizures, "no formal policy of the Department of Justice prohibit[ed] its prosecutors or officers from pursuing pre-trial seizures, and enforcement practices may change at any time in any case." Id. If this was sufficient to render the claim justiciable in Adult Video Ass'n, Thomas and Baker's claim must similarly be justiciable because they do not rely upon the mere possibility that "enforcement practices may change"--the anti-discrimination laws they challenge have been and are presently being enforced.
 
 
 10
 The Supreme Court has held that when plaintiffs like Thomas and Baker wish to engage in conduct proscribed by statutes, they may challenge those statutes prior to enforcement where their fear of enforcement or the alleged threats of enforcement are "not imaginary or wholly speculative." Babbitt, 442 U.S. at 302, 99 S.Ct. 2301; see also Adult Video Ass'n, 960 F.2d at 785 (concluding that claim was justiciable because "apprehension" concerning enforcement was "reasonable"); Darring v. Kincheloe, 783 F.2d 874, 877 (9th Cir.1986) ("[A]n 'imaginary or speculative' fear of prosecution is not enough."). In view of the facts (1) that Thomas and Baker continue to violate the antidiscrimination laws, (2) that the laws have been, and presently are being, enforced against similarly situated landlords, (3) that Alaska and Anchorage authorities are aware of Thomas and Baker's persistent refusals to rent to unmarried couples, and (4) that the state human rights commission is under an ongoing and affirmative duty to seek out and to punish offending conduct, we cannot say that Thomas and Baker's fears of enforcement or alleged threats of enforcement are "imaginary or wholly speculative." Thus, their claims would appear to be justiciable.
 
 
 11
 This demonstration of a "reasonable threat" may end the ripeness inquiry. In Adult Video Ass'n, we held that "a conclusion that a reasonable threat of prosecution exists, for purposes of standing, effectively dispenses with any ripeness problem." 960 F.2d at 786. AERC insists, however, that a reviewing court must also determine that the issues before it are "fit for judicial decision." San Diego County Gun Rights Comm., 98 F.3d at 1132. While we agree with Adult Video Ass'n 's conclusion that a reasonable threat of prosecution "effectively dispenses with any ripeness problem," 960 F.2d at 786, we also believe there can be little dispute that the issues here are fit for judicial resolution when considered under the prudential component of the ripeness inquiry. See Portman, 995 F.2d at 902 (recognizing that "[t]he ripeness inquiry contains both a constitutional and a prudential component").
 
 
 12
 The "prudential" component of ripeness "focuses on whether there is an adequate record upon which to base effective review." Portman, 995 F.2d at 903. On that score, AERC maintains, "[t]he inadequacy of the factual record below makes this case unripe for judicial determination." Indeed, it contends that facts "critical" to the adjudication of the constitutional questions at issue are absent from the record. AERC complains, for instance, that there is no evidence in the record regarding the identity of potential tenants turned away by Thomas and Baker and that the record does not reveal Thomas and Baker's "actual" motivations for refusing to rent to unmarried individuals. AERC's "prudential" ripeness argument misses the mark. The identity of potential tenants is simply not relevant to any issue bearing on the case. Thomas and Baker admitted that they have turned away, and continue to turn away, prospective tenants based upon their marital status. The relevant class of potential tenants, therefore, is all unmarried couples. Moreover, Thomas and Baker's religious motivations were uncontested in the district court. Nor were they seriously contested before us.
 
 
 13
 We have found issues unripe for review when a decision "would be devoid of any factual context whatsoever," San Diego Gun Rights Comm., 98 F.3d at 1132, or would "rest[ ] upon [a] hypothetical situation[ ]," Portman, 995 F.2d at 903. The record in this case suffers from no such grave defect. There are no "insuperable obstacles," Rescue Army v. Municipal Court, 331 U.S. 549, 574, 67 S.Ct. 1409, 91 L.Ed. 1666 (1947), to our reaching a decision on the merits of the underlying constitutional claims. Quite the contrary, as shall become clear in parts below, we have before us all the facts we need to issue an informed decision, among them (1) that Thomas and Baker sincerely believe that cohabitation is a sin, (2) that on that basis, they have refused, and continue to refuse, to rent to unmarried couples, in violation of Alaska law, and (3) that the options available to the landlords are surrendering their beliefs, violating the law, and giving up their livelihoods in residential real estate. These facts--the facts essential to our decision--are, as the district court found, "undisputed." The parties' arguments center not upon differing interpretations of the record, but instead upon the differing interpretations of the relevant legal standards. Such "pure legal questions that require little factual development are more likely to be ripe" than fact-intensive claims. San Diego Gun Rights Comm., 98 F.3d at 1132.
 
 
 14
 This simply is not a "sketchy record ... with many unknown facts." American-Arab Anti-Discrimination Comm. v. Thornburgh, 970 F.2d 501, 510 (9th Cir.1991). It is, we conclude, "an adequate record upon which to base effective review." Portman, 995 F.2d at 903. We therefore agree with the district court's decision insofar as it held the landlords' claims ripe for judicial review, and now turn to an examination of those claims.
 
 III
 
 15
 In Employment Division v. Smith, 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990), the Supreme Court reviewed the constitutionality of an Oregon law that criminalized the ingestion of peyote, as applied to two individuals who claimed that they used the drug as part of a religious ceremony of the Native American Church. In upholding the law against a Free Exercise Clause challenge, the Court held that "the right of free exercise does not relieve an individual of the obligation to comply with a 'valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes).' " Id. at 879, 110 S.Ct. 1595 (quoting United States v. Lee, 455 U.S. 252, 263 n. 3, 102 S.Ct. 1051, 71 L.Ed.2d 127 (1982) (Stevens, J., concurring in the judgment)). The Court's holding in Smith has become the backbone of recent Free Exercise Clause jurisprudence, as most burdens on religious liberty are not direct and intentional, but rather the largely unintended incident of neutral, generally applicable regulations.[6] The Court has made clear, however, that "[a] law failing to satisfy [the Smith ] requirements [of neutrality and general applicability] must be justified by a compelling governmental interest and must be narrowly tailored to advance that interest." Church of the Lukumi Babalu Aye v. City of Hialeah, 508 U.S. 520, 531, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993).
 
 
 16
 Citing Lukumi, Thomas and Baker contend that the statute and ordinance at issue in this case fail to satisfy Smith 's requirement that laws be of "general applicability" and are thus subject to strict First Amendment scrutiny. The Lukumi decision involved a series of Hialeah, Florida, ordinances that the Court found "target[ed]" certain religious practices--specifically, ritual animal sacrifice--of the Santeria religion. See id. at 542, 113 S.Ct. 2217. The Court concluded that the ordinances were neither neutral nor generally applicable. See id. at 532-546, 113 S.Ct. 2217. The Court therefore subjected the ordinances to "the most rigorous of scrutiny" and ultimately voided them as in violation of the Free Exercise Clause. Id. at 546, 113 S.Ct. 2217.
 
 
 17
 With respect to the requirement of general applicability, the Lukumi Court started from the proposition that government "cannot in a selective manner impose burdens only on conduct motivated by religious belief." Id. at 543, 113 S.Ct. 2217 (emphasis added). Observing that the ordinances contained numerous exemptions (that seemingly permitted all animal killings except those of the Santeria), the Court rejected the City's claim that the ordinances there at issue advanced the twin interests of protecting public health and preventing animal cruelty: "The ordinances are underinclusive for those ends. They fail to prohibit nonreligious conduct that endangers these interests in a similar or greater degree than Santeria sacrifice does." Id. In other words, considering the numerous exemptions, it was clear that "each of Hialeah's ordinances pursue[d] the city's governmental interests only against conduct motivated by religious belief." Id. at 545, 113 S.Ct. 2217. The Court thus concluded that "the ordinances [we]re drafted with care to forbid few killings but those occasioned by religious sacrifice." Id. at 543, 113 S.Ct. 2217.
 
 
 18
 Thomas and Baker claim that, like the ordinances at issue in Lukumi, the Alaska laws are "underinclusive and, therefore, not generally applicable." Specifically, they point to the fact that the Alaska statute prohibits "refus[ing] to sell, lease, or rent the real property to a person because of ... marital status" but expressly allows "the sale, lease or rental of classes of real property commonly known as housing for 'singles' or 'married couples' only." Alaska Stat. § 18.80.240. Likewise, they note that the Anchorage ordinance excepts from its scope landlords who rent space in "individual home[s] wherein the renter or lessee would share common living areas with the owner, lessor, manager, agent or other person." Anchorage Mun.Code § 5.20.020. Because, Thomas and Baker argue, "[b]y way of these laws marital status discrimination is specifically allowed under certain circumstances," the laws are constitutionally suspect.
 
 
 19
 The underinclusiveness at play in Lukumi, however, was of a different constitutional order altogether from that at issue here. There, "the underinclusion [was] substantial, not inconsequential." Lukumi, 508 U.S. at 543, 113 S.Ct. 2217. There, the ordinances were "drafted with care to forbid few killings but those occasioned by religious sacrifice." Id. Here, in contrast to the situation in Lukumi, the "underinclusion"--which consists of only a single exception per challenged provision--is relatively inconsequential. Boiled down, in Lukumi, the ordinances applied essentially only to the Santeria; here, the challenged laws apply essentially to all landlords.
 
 
 20
 Underinclusiveness is not in and of itself a talisman of constitutional infirmity; rather, it is significant only insofar as it indicates something more sinister. In Lukumi, the Court considered the ordinances' lack of neutrality and general applicability as a proxy of the Hialeah lawmakers' illicit intention to single out the Santeria religion for unfavorable treatment. The Court observed that the pattern of exemptions present in the Hialeah ordinances betrayed their object as one of suppressing religious exercise. See id. at 533-46, 113 S.Ct. 2217. Because the ordinances were "designed to persecute or oppress a religion or its practices," id. at 547, 113 S.Ct. 2217, the Court concluded that the permissive Smith standard did not apply.
 
 
 21
 There is no hint that the Alaska laws were "drafted with care to forbid few [instances of marital status discrimination] but those occasioned by religious [conviction]." Id. at 543, 113 S.Ct. 2217. Nor do the laws "in a selective manner impose burdens only on conduct motivated by religious belief." Id. at 543, 113 S.Ct. 2217 (emphasis added). There is, in sum, no indication that Alaska lawmakers were impelled by a desire to target or suppress religious exercise. The housing laws, we think, have the purpose of preventing discrimination on the basis of marital status; any burden on religiously motivated conduct, even if substantial, is incidental. Consequently, absent some other exception, Smith, not Lukumi, governs the landlords' claims.
 
 IV
 
 22
 Thomas and Baker insist that the laws here at issue do fall within the scope of a second exception to Smith: the so-called "hybrid-rights" exception. In so arguing, they point to the following language from the Court's opinion in Smith:
 
 
 23
 The only decisions in which we have held that the First Amendment bars application of a neutral, generally applicable law to religiously motivated action have involved not the Free Exercise Clause alone, but the Free Exercise Clause in conjunction with other constitutional protections, such as freedom of speech and of the press, see Cantwell v. Connecticut, 310 U.S., at 304-307, 60 S.Ct. 900 (invalidating a licensing system for religious and charitable solicitations under which the administrator had discretion to deny a license to any cause he deemed nonreligious); Murdock v. Pennsylvania, 319 U.S. 105, 63 S.Ct. 870, 87 L.Ed. 1292 (1943) (invalidating a flat tax on solicitation as applied to the dissemination of religious ideas); Follett v. McCormick, 321 U.S. 573, 64 S.Ct. 717, 88 L.Ed. 938 (1944) (same), or the rights of parents, acknowledged in Pierce v. Society of Sisters, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925), to direct the education of their children, see Wisconsin v. Yoder, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972) (invalidating compulsory school-attendance laws as applied to Amish parents who refused on religious grounds to send their children to school).
 
 
 24
 Smith, 494 U.S. at 881, 110 S.Ct. 1595 (parallel citations omitted). The Court in Smith found that the facts of that case did not present "such a hybrid situation, but a free exercise claim unconnected with any communicative activity or parental right." Id. at 882, 110 S.Ct. 1595 (emphasis added).
 
 
 25
 Thomas and Baker contend that the Alaska housing laws implicate not only their rights to free exercise, but other constitutional rights as well. Consequently, they argue that their claims are within the hybrid-rights exception to Smith and require strict scrutiny. They first claim that the laws' prohibitions against "refus[ing] to sell, lease[,] or rent" to unmarried cohabitants, Alaska Stat. § 18.80.240(1); Anchorage Mun.Code § 5.20.020(A), infringe their rights, grounded in the Fifth Amendment, to exclude others from their property. Thomas and Baker also maintain that certain portions of the housing laws burden their First Amendment free speech rights. Specifically, they point to the provisions of the laws that make it unlawful for a landlord to "make a written or oral inquiry or record" of the marital status of a prospective lessee, Alaska Stat. § 18.80.240(3); Anchorage Mun.Code § 5.20.020(C), or to "represent to a person that real property is not available for inspection, sale, rental, or lease" on the basis of the lessee's marital status, Alaska Stat. § 18.80.240(5); Anchorage Mun.Code § 5.20.020(E). The Anchorage ordinance also prohibits landlords to "make, print or publish" any communication or statement indicating any preference or discrimination based upon marital status. Anchorage Mun.Code § 5.20.020(G).
 
 
 26
 * Before determining whether the landlords' hybrid-rights argument succeeds on the merits, we must decide whether a hybrid-rights exception to Smith actually exists and, if so, exactly what a hybrid-rights claim entails. Addressing the issue, the district court concluded:
 
 
 27
 These prohibitions ... impact plaintiffs' freedom of speech and bring this case within the purview of those hybrid cases acknowledged by the Supreme Court in Smith. Plaintiffs assert a colorable claim under the First Amendment and the compelling interest test should be applied.
 
 
 28
 In a footnote, the court clarified its understanding of the hybrid-rights exception's scope:
 
 
 29
 Plaintiffs do not contend that they could "carry the day" with these First Amendment arguments, nor does the Smith decision imply any such requirement. Plaintiffs simply assert that their free speech rights are implicated in this case along with their free exercise rights, and therefore the compelling interest test should be used. The court agrees.
 
 
 30
 Thomas and Baker substantially agree with the district court's characterization of the hybrid-rights exception as turning upon the demonstration of a "colorable claim." They contend that it is sufficient to trigger strict scrutiny that their free speech and property rights were "burdened." Appellant Haley, by contrast, maintains that the "companion" right (the non-free-exercise half of the hybrid) must itself be constitutionally "protected," that is, it must be independently viable.
 
 
 31
 The Supreme Court has been somewhat less than precise with regard to the nature of hybrid rights. In Smith, the Court referred to claims involving the Free Exercise Clause "in conjunction with" or "[ ]connected with" other constitutional protections. Smith, 494 U.S. at 881, 110 S.Ct. 1595. Last Term, in City of Boerne v. Flores, 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997), the Court paraphrased the Smith hybrid passage and spoke of cases that "implicated" other constitutional rights alongside free exercise freedoms. See id. at 2161, 117 S.Ct. 2157. Perhaps not surprisingly in view of the Supreme Court's rather cryptic explanations, the courts of appeals have struggled to decipher Smith 's hybrid-rights formula and have reached divergent conclusions as to exactly what constitutes a hybrid-rights claim. The First and District of Columbia Circuits have suggested that Smith mandates the existence of an independently viable companion right in addition to free exercise. See EEOC v. Catholic University of America, 83 F.3d 455, 467 (D.C.Cir.1996) (holding that an independent Establishment Clause violation triggered the hybrid exception); Brown v. Hot, Sexy & Safer Prods., 68 F.3d 525, 539 (1st Cir.1995) (concluding that the hybrid exception was not triggered because the plaintiffs had not shown an independent substantive due process violation). The Tenth Circuit, on the other hand, requires only a "colorable claim of infringement," that is, something less than an outright violation of a companion right yet more than a simple allegation. See Swanson v. Guthrie Indep. Sch. Dist. No. I-L, 135 F.3d 694, 700 (10th Cir.1998).
 
 
 32
 We have never explored in any detail the contours of the so-called hybrid-rights doctrine.[7] In undertaking that task today, we must at the outset confess that none of the contending interpretations of Smith 's hybrid-rights passage is perfect. Each, unfortunately, entails certain logical and interpretive difficulties.[8] Indeed, faced with what it viewed as the "complete[ ] illogic[ ]" of the hybrid-rights exception, the Sixth Circuit opted to ignore it altogether and to proceed as if Smith applied categorically to all neutral, generally applicable laws incidentally burdening free exercise rights. See Kissinger v. Board of Trustees, 5 F.3d 177, 180 (6th Cir.1993) ("[A]t least until the Supreme Court holds that legal standards under the Free Exercise Clause vary depending upon whether other constitutional rights are implicated, we will not use a stricter test than that used in Smith to evaluate generally applicable, exceptionless state regulations under the Free Exercise Clause."). Although undoubtedly the path of least resistance, there is a salient problem with the Sixth Circuit's decision simply to throw up its hands in despair: Smith did not overrule Cantwell, Murdock, Follett, and Yoder; it distinguished them. Those cases--each of which requires an exemption from a neutral, generally applicable law (and thus contradicts the central holding of Smith )--remain on the books and are binding on lower courts. We are not at liberty to ignore them.
 
 
 33
 We therefore turn, as we believe we must, to consider the nature of "hybrid" rights.
 
 B
 
 34
 We begin our analysis, perhaps paradoxically, with Justice Souter's separate concurrence in Lukumi, in which he roundly criticized Smith 's notion of hybrid-rights:
 
 
 35
 [T]he distinction Smith draws strikes me as ultimately untenable. If a hybrid claim is simply one in which another constitutional right is implicated, then the hybrid exception would probably be so vast as to swallow the Smith rule, and, indeed, the hybrid exception would cover the situation exemplified by Smith, since free speech and associational rights are certainly implicated in the peyote ritual. But if a hybrid claim is one in which a litigant would actually obtain an exemption from a formally neutral, generally applicable law under another constitutional provision, then there would have been no reason for the Court in what Smith calls hybrid cases to have mentioned the Free Exercise Clause at all.
 
 
 36
 Lukumi, 508 U.S. at 567, 113 S.Ct. 2217 (Souter, J., concurring). In other words, according to Justice Souter, the application of the hybrid-rights exception can turn neither upon the fact that a companion right is "implicated" (else the central holding of Smith vanishes) nor upon the existence of a fully protected, independently viable companion right (else the Free Exercise Clause itself vanishes).
 
 
 37
 Justice Souter was clearly correct, we think, to reject an independently-viable-rights theory of hybrid rights. We acknowledge that, in siding with Justice Souter, we part company with two of our sister circuits. See Catholic University of America, 83 F.3d at 467; Hot, Sexy & Safer, 68 F.3d at 539. Nonetheless, the Supreme Court's repeated references to the Free Exercise Clause in the so-called hybrid cases leave us with little doubt that, whatever else it did, the Court did not rest its decisions in those cases upon the recognition of independently viable free speech and substantive due process rights. See Yoder, 406 U.S. at 214, 215, 218, 219-220, 92 S.Ct. 1526 (alluding to the Free Exercise Clause); Follett, 321 U.S. at 576, 577, 64 S.Ct. 717 (same); Murdock, 319 U.S. at 107, 108, 111, 114, 115, 63 S.Ct. 870 (same); Cantwell, 310 U.S. at 300, 303, 305, 307, 60 S.Ct. 900 (same). We will not lightly presume that, in specifically and continually invoking the Free Exercise Clause, the Supreme Court was wasting its breath. Just as we do when faced with a declaration of the legislative department, see, e.g., Park 'N Fly, Inc. v. Dollar Park & Fly, Inc., 469 U.S. 189, 194, 105 S.Ct. 658, 83 L.Ed.2d 582 (1985) ("Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose."), we must take a judicial pronouncement at face value. We will not speculate or hypothesize about the Justices' "true" intentions; rather, we will assume that those intentions are expressed in the words the Justices carefully chose to express the opinion of the Court. When the Court said "Free Exercise Clause," it meant it.
 
 
 38
 We also agree with Justice Souter's observation that the mere fact that a companion right is "implicated" cannot serve as the touchstone for heightened scrutiny. Government action will almost always "implicate" a host of constitutional rights, even though it does not seriously threaten, much less violate, any of them. Hence, under a permissive "implication" standard, rarely if ever would a neutral, generally applicable law be subject to the general rule of Smith (including, as Justice Souter pointed out, the Oregon law at issue in Smith itself). The same conclusion follows a fortiori if all that is needed to trigger strict scrutiny is the mere allegation of a companion right.
 
 
 39
 Although we accept Justice Souter's premises, we cannot subscribe to his ultimate conclusion--that the hybrid-rights doctrine is "untenable." Instead, we believe that the best understanding of Smith actually suggests an approach to hybrid-rights claims that falls somewhere between the two extremes marked out by Justice Souter. That is to say, an individual claiming to be within the hybrid-rights exception may not rest upon a bald assertion that a companion right exists or the fact that a companion right is somehow "implicated" by a government policy. Nor, however, is he required to show that the law he challenges is invalid under a companion provision alone, without regard to the Free Exercise Clause. Like our colleagues on the Tenth Circuit, and like the district court here, we conclude that a plaintiff invoking Smith 's hybrid exception must make out a "colorable claim" that a companion right has been infringed. See Swanson, 135 F.3d at 700.
 
 
 40
 To be sure, a "colorable claim" standard does not provide the exactitude of an allegation-only standard or an independently-viable-rights standard; it will require courts reviewing free exercise claims to make difficult, qualitative, case-by-case judgments regarding the strength of companion-claim arguments. The term "colorable" certainly is not meaningless, however. Webster's provides what we think is a useful explanation, defining colorable to mean "seemingly valid and genuine." Webster's Third New International Dictionary 449 (1986). Nor is the word "colorable" a term without legal pedigree. For instance, in habeas cases not governed by the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104-132, 110 Stat. 1214, Supreme Court precedent dictates that courts need only entertain successive petitions in which the prisoner supplements his constitutional claim with a "colorable showing of factual innocence." Kuhlmann v. Wilson, 477 U.S. 436, 454, 106 S.Ct. 2616, 91 L.Ed.2d 364 (1986). In Kuhlmann, the Supreme Court explained its colorable-showing standard as requiring that the petitioner demonstrate a "fair probability" that "the trier of facts would have entertained a reasonable doubt of his guilt." Id. at 454 n. 17, 106 S.Ct. 2616 (quoting Henry J. Friendly, Is Innocence Irrelevant? Collateral Attack on Criminal Judgments, 38 U. Chi. L.Rev. 142, 160 (1970)) (internal quotation marks omitted). Similarly, only recently, the Supreme Court observed that a defendant seeking to obtain discovery on a selective prosecution claim must establish a "colorable basis" for the claim, and acknowledged a consensus among courts of appeals that the colorable-basis standard "require[s] some evidence tending to show the existence of the essential elements of the defense." United States v. Armstrong, 517 U.S. 456, 468, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996); accord United States v. Bourgeois, 964 F.2d 935, 938-39 (9th Cir.1992). Courts engage in similarly complex, fact-sensitive inquiries in other contexts, albeit without specifically employing the term "colorable." See, e.g., Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412(d)(1)(A) (stating that the determination whether to award fees to a prevailing party in a civil case brought by or against the United States depends upon whether the government's position, although incorrect, was "substantially justified"); Pierce v. Underwood, 487 U.S. 552, 565, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988) (interpreting EAJA's "substantially justified" language to mean having a "reasonable basis in both law and fact"). Indeed, the colorable-claim standard we adopt today for evaluating hybrid-rights claims is not altogether different from the traditional "likelihood of success on the merits" test that governs the issuance of preliminary injunctive relief. See Coalition for Economic Equity v. Wilson, 110 F.3d 1431, 1438 (9th Cir.1997) ("A preliminary injunction may issue 'if the movant has shown either a likelihood of success on the merits and the possibility of irreparable injury, or that serious questions are raised and the balance of hardships tips sharply in the movant's favor.' " (quoting Armstrong v. Mazurek, 94 F.3d 566, 567 (9th Cir.1996))). Consequently, although not perfectly precise, the colorable-claim test is not standardless. Rather, despite subtle variations, there is, we think, a certain "center of gravity" to these formulations that informs our understanding of what it means to state a "colorable" claim: In order to trigger strict scrutiny, a hybrid-rights plaintiff must show a "fair probability"--a "likelihood"--of success on the merits of his companion claim.
 
 
 41
 Furthermore, particularly in view of the interpretive difficulties surrounding Smith 's hybrid-rights passage, we believe that any hybrid rule's administrability must play second fiddle to its consistency with Supreme Court precedent. And on that score, a colorable-claim standard is clearly superior to the alternatives. It avoids the pitfalls of both the more permissive "implication" and "allegation-only" tests and the more exacting "independently-viable-rights" test identified by Justice Souter. Under an implication standard, the claims raised in Smith would themselves have been within the scope of the hybrid-rights exception (not the general rule), since free speech rights "are certainly implicated in the peyote ritual," Lukumi, 508 U.S. at 567, 113 S.Ct. 2217 (Souter, J., concurring) (emphasis added). An implication standard thus renders the result in Smith--that no hybrid claim was demonstrated and that strict scrutiny was therefore inapplicable--a non sequitur. The colorable-claim standard we adopt engenders no such problem. The plaintiffs in Smith could not have made out a "colorable claim of infringement" with respect to their free speech rights. Ingesting peyote is certainly not "speech" in the traditional sense; at best, it is "expressive conduct." And the only cases in which the Supreme Court has invalidated laws regulating expressive conduct are those in which it has concluded that the government has prohibited such conduct "precisely because of its communicative attributes." Barnes v. Glen Theatre, Inc., 501 U.S. 560, 576, 111 S.Ct. 2456, 115 L.Ed.2d 504 (1991) (Scalia, J., concurring in the judgment) (citing United States v. Eichman, 496 U.S. 310, 110 S.Ct. 2404, 110 L.Ed.2d 287 (1990), Texas v. Johnson, 491 U.S. 397, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989), Spence v. Washington, 418 U.S. 405, 94 S.Ct. 2727, 41 L.Ed.2d 842 (1974), Tinker v. Des Moines Indep. Comm. Sch. Dist., 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969), Brown v. Louisiana, 383 U.S. 131, 86 S.Ct. 719, 15 L.Ed.2d 637 (1966), and Stromberg v. California, 283 U.S. 359, 51 S.Ct. 532, 75 L.Ed. 1117 (1931)). There was no serious argument in Smith that the Oregon legislature had targeted the respondents' use of peyote because of the message it conveyed. Hence, given a colorable-claim standard of hybrid rights, Smith was decided exactly as it should have been. On the other hand, whereas an independently-viable-rights interpretation of hybrid rights cannot reasonably explain the Supreme Court's repeated allusions to the Free Exercise Clause in Cantwell, Murdock, Follett, and Yoder, a colorable-claim standard jibes perfectly with the Court's side-by-side references to the Free Exercise Clause and free speech and substantive due process rights in those cases. Consequently, among the potential approaches to hybrid rights, only a colorable-claim standard accounts both for Smith (which an implication standard cannot) and for the original hybrid cases (which an independently-viable-rights standard cannot).
 
 
 42
 Because, under the rule we announce today, a free exercise plaintiff must make out a "colorable claim" that a companion right has been violated--that is, a "fair probability" or a "likelihood," but not a certitude, of success on the merits--neither the central holding of Smith nor the Free Exercise Clause is rendered without substantive bite. Our colorable-claim standard is therefore neither too lax nor too strict, but "just right."
 
 C
 
 43
 We now turn to consider whether Thomas and Baker have demonstrated a "colorable claim of infringement" with respect to their so-called companion rights. Recall that they complain that the laws infringe their Fifth Amendment "right to exclude" and their First Amendment right to free speech. Because the landlords' principal complaint is that the Alaska laws purport to require them actually to rent to unmarried cohabitants, we consider the Fifth Amendment claim first.
 
 
 44
 * Thomas and Baker contend that the Takings Clause of the Fifth Amendment,[9] "provides a property owner constitutional protection to exclude others from the owners (sic) property." It is true that the Supreme Court has "repeatedly held that ... the right to exclude [others is] 'one of the most essential sticks in the bundle of rights that are commonly characterized as property.' " Nollan v. California Coastal Comm'n, 483 U.S. 825, 831, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987) (quoting Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 433, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982) (quoting Kaiser Aetna v. United States, 444 U.S. 164, 176, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979))); accord 2 William Blackstone, Commentaries on the Laws of England * 8 ("[O]ccupancy gave the right to ... exclude[ ] every one else but the owner from the use of it."). Technically speaking, however, the Takings Clause does not "provide" the right to exclude; it merely protects against that right being "taken ... without just compensation." The relevant inquiry, therefore, is not whether Thomas and Baker possess a right to exclude others from their rental properties. They do. The question is whether, by forbidding them from "refus[ing] to sell, lease[,] or rent the real property to a person because of ... marital status," the State (or the municipality, as the case may be) has "taken" that right.
 
 
 45
 There has, of course, been a "taking" in the literal sense. Insofar as they are compelled by the laws at issue to entertain the rental applications of unmarried cohabitants, Thomas and Baker are prevented from fully exercising their rights to exclude. See PruneYard Shopping Center v. Robins, 447 U.S. 74, 82, 100 S.Ct. 2035, 64 L.Ed.2d 741 (1980). However, "not every destruction or injury to property by governmental action has been held to be a 'taking' in the constitutional sense." Armstrong v. United States, 364 U.S. 40, 48, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960). The question whether a law gives rise to an unconstitutional taking depends upon the nature of the challenged government action. As the Supreme Court explained in Yee v. City of Escondido, 503 U.S. 519, 112 S.Ct. 1522, 118 L.Ed.2d 153 (1992), Takings Clause cases generally fall into one of two categories:
 
 
 46
 Where the government authorizes a physical occupation of property (or actually takes title), the Takings Clause generally requires compensation. See, e.g., Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 426, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982). But where the government merely regulates the use of property, compensation is required only if considerations such as the purpose of the regulation or the extent to which it deprives the owner of the economic use of the property suggest that the regulation has unfairly singled out the property owner to bear a burden that should be borne by the public as a whole. See, e.g., Penn Central Transportation Co. v. New York City, 438 U.S. 104, 123-125, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978). The first category of cases requires courts to apply a clear rule; the second necessarily entails complex factual assessments of the purposes and economic effects of government actions.
 
 
 47
 Id. at 522-23, 112 S.Ct. 1522 (parallel citations omitted).
 
 
 48
 In Yee, a group of mobile home owners challenged the constitutionality of a local rent control ordinance. Viewed in conjunction with California's Mobilehome Residency Law, Cal. Civ.Code Ann. § 798, they argued, the ordinance unconstitutionally required the owners to submit to a permanent physical occupation of their property under the Loretto line of cases. The Supreme Court, however, rejected their claim. Significantly, the Court expressly rejected the notion, urged by the landowners, that they possessed a per se Takings Clause right to "choose their incoming tenants." Id. at 530-31, 112 S.Ct. 1522. Rather, the Court acknowledged, "[w]hen a landowner decides to rent his land to tenants, the government may ... require the landowner to accept tenants he does not like ... without automatically having to pay compensation." Id. at 529, 112 S.Ct. 1522 (citing Heart of Atlanta Motel, Inc. v. United States, 379 U.S. 241, 261, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964)) (emphasis added).
 
 
 49
 The Yee Court's holding, however, was narrow. The Court simply concluded that because the mobile home owners had "voluntarily open[ed] their property to occupation by others, [they could not] assert a per se right to compensation based on their inability to exclude particular individuals." Id. at 531, 112 S.Ct. 1522. The Court expressly acknowledged that a landlord's inability to choose his tenants "may be relevant to a regulatory taking argument, as it may be one factor a reviewing court would wish to consider in determining whether the ordinance unjustly imposes a burden on [a] petitioner[ ] that should 'be compensated by the government, rather than remain[ing] disproportionately concentrated on a few persons.' " Id. at 531, 112 S.Ct. 1522 (quoting Penn Central Transp. Co. v. City of New York, 438 U.S. 104, 124, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978)) (emphasis added).[10]
 
 
 50
 In judging whether a government regulation of property constitutes a "regulatory taking," a reviewing court must undertake an "essentially ad hoc, factual inquir[y]." Kaiser Aetna v. United States, 444 U.S. 164, 175, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979). The Supreme Court has, however, recognized three factors as particularly important to the regulatory-taking calculus: (1) the economic impact of the regulation on the claimant, (2) the extent to which the regulation has interfered with distinct investment-backed expectations, and (3) the character of the governmental action. See Eastern Enterprises v. Apfel, 524 U.S. 498, ----, 118 S.Ct. 2131, 2135, 141 L.Ed.2d 451 (1998); Penn Central, 438 U.S. at 124, 98 S.Ct. 2646.
 
 
 51
 Thomas and Baker have not alleged that the laws at issue interfere with their investment-backed expectations or otherwise adversely impact their economic interests. Nor could they, it would seem, at least absent a showing that, by renting to unmarried couples in accordance with the challenged laws, their net number of "units rented" would go down. Common sense would appear to dictate the opposite conclusion: A rule requiring a landlord to rent to a certain class of otherwise disqualified people would enlarge the pool of prospective renters, and thus perhaps increase--but certainly not decrease--his bottom line by reducing the likelihood that any given apartment would remain vacant.
 
 
 52
 The Supreme Court has consistently acknowledged, however, that the "bottom line" is not the sole measure of a successful Takings Clause claim. In Loretto, for instance, the Court concluded that a property right had been "taken" notwithstanding the fact that the claimed infringement--a requirement that apartment owners permit the installation of cable television boxes and wires on their buildings--in all likelihood increased the value of the owners' property. See Loretto, 458 U.S. at 437 n. 15, 102 S.Ct. 3164. Indeed, just last Term, the Court reaffirmed its "longstanding" commitment to the proposition that "property is more than economic value; it also consists of 'the group of rights which the so-called owner exercises in his dominion of the physical thing,' such 'as the right to possess, use and dispose of it." Phillips v. Washington Legal Found., 524 U.S. 156, ----, 118 S.Ct. 1925, 1933, 141 L.Ed.2d 174 (1998) (quoting United States v. General Motors Corp., 323 U.S. 373, 380, 65 S.Ct. 357, 89 L.Ed. 311 (1945)) (internal citations omitted). The Alaska laws may not reduce the monetary value of Thomas and Baker's property; however, there can be no doubt that the laws interfere with the landlords' "dominion" and "possess[ion]" of that property.
 
 
 53
 Under the "character-of-the-regulation" prong of the regulatory takings analysis, "[a] 'taking' may more readily be found when the interference with property can be characterized as a physical invasion by government than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the social good." Penn Central, 438 U.S. at 124, 98 S.Ct. 2646. Although the Alaska housing laws do not, under Yee, rise to the level of a permanent physical occupation sufficient to trigger a per se right to compensation, they authorize a "physical invasion" of the landlords' property just the same. We thus conclude that Thomas and Baker have made out a substantial argument that the Alaska laws "go[ ] too far," Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 415, 43 S.Ct. 158, 67 L.Ed. 322 (1922), and, thus, a colorable claim that their rights under the Takings Clause of the Fifth Amendment have been infringed. Hence, the Fifth Amendment serves to "hybridize" their Free Exercise Clause challenge to § 18.80.240(1) of the Alaska statute and § 5.20.020(A) of the Anchorage ordinance.
 
 2
 
 54
 With respect to Thomas and Baker's free speech challenge,[11] Haley contends that the expression at issue in this case is "constitutionally unprotected" commercial speech. Although so-called commercial speech is not outside the scope of the First Amendment, the Supreme Court has made clear that "[t]he Constitution ... affords a lesser protection to commercial speech than to other constitutionally guaranteed expression." United States v. Edge Broadcasting Co., 509 U.S. 418, 426, 113 S.Ct. 2696, 125 L.Ed.2d 345 (1993). Consequently, "[b]ecause the degree of protection afforded by the First Amendment depends upon whether the activity sought to be regulated constitutes commercial or non-commercial speech, we must first determine the proper classification of the [expression] at issue here." Bolger v. Youngs Drug Prods. Corp., 463 U.S. 60, 66, 103 S.Ct. 2875, 77 L.Ed.2d 469 (1983).
 
 
 55
 * There is no litmus test for distinguishing commercial from noncommercial expression. Indeed, the Supreme Court itself has acknowledged that the "precise bounds" of commercial speech are "subject to doubt." Zauderer v. Supreme Court of Ohio, 471 U.S. 626, 637, 105 S.Ct. 2265, 85 L.Ed.2d 652 (1985). Until relatively recently, the Court seemed to treat commercial speech as if it entailed both a "core" and a "periphery." Inside the core was expression that did "no more than propose a commercial transaction." Virginia Pharmacy Board v. Virginia Citizens Consumer Council, Inc., 425 U.S. 748, 762, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976); see also Bolger, 463 U.S. at 66, 103 S.Ct. 2875 (dubbing speech that "does no more than propose a commercial transaction" the "core notion" of commercial speech). Core commercial speech included "advertising pure and simple," Zauderer, 471 U.S. at 637, 105 S.Ct. 2265, as well as other expression reducible to the formula, "I will sell you the X at the Y price," Virginia Pharmacy, 425 U.S. at 762. Speech outside the core, the Court held, "present[ed] a closer [First Amendment] question." Reviewing courts therefore had to "examine[ ] carefully" restrictions that transcended the core of commercial speech "to ensure that speech deserving of greater constitutional protection [was] not inadvertently suppressed." Bolger, 463 U.S. at 66, 103 S.Ct. 2875. As a guide, the Supreme Court in Bolger set out three indicia of non-core commercial speech: (1) an advertising format; (2) a reference to a specific product; and (3) an underlying economic motive of the speaker. See Bolger, 463 U.S. at 67, 103 S.Ct. 2875.
 
 
 56
 In recent years, the Court appears quite self-consciously to have pared down the definition of commercial speech. In City of Cincinnati v. Discovery Network, Inc., 507 U.S. 410, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993), the Court renounced as too broad its earlier characterization of commercial speech in Central Hudson Gas and Electric Corp. v. Public Service Commission, 447 U.S. 557, 561, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980), as any "expression related solely to the economic interests of the speaker and its audience." See Discovery Network, 507 U.S. at 422, 113 S.Ct. 1505 ("We did not ... use that definition in either Bolger v. Youngs Drug Products Corp., 463 U.S. 60, 103 S.Ct. 2875, 77 L.Ed.2d 469 (1983), or in Board of Trustees of State University of N.Y. v. Fox, 492 U.S. 469, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989)." (parallel citations omitted)). The Court in Discovery Network also cast serious doubt upon Bolger 's bifurcated core-periphery framework. See id. at 423, 113 S.Ct. 1505. The Court strongly suggested that the only type of expression that is "commercial" in the constitutional sense is that which does "no more than propose a commercial transaction." Citing its decision in Fox, the Court held that "the proposal of a commercial transaction [is] 'the test for identifying commercial speech.' " Id. (quoting Fox, 492 U.S. at 473-74, 109 S.Ct. 3028) (emphasis in Discovery Network ).
 
 
 57
 It seems clear enough that the speech restrictions at issue in this case are not aimed solely at proscribing expression that does "no more than propose a commercial transaction." Rather, they go much farther, and make it unlawful for a landlord (1) to "make a written or oral inquiry or record" of the marital status of a prospective lessee, (2) to "represent to a person that real property is not available for inspection, sale, rental, or lease" on the basis of the lessee's marital status, or (3) to "make, print or publish" any communication or statement indicating any preference or discrimination based upon marital status. Alaska Stat. § 18.80.240; Anchorage Mun.Code § 5.20.020. This simply is not a case of "I will sell you X at the Y price." Virginia Pharmacy, 425 U.S. at 762, 96 S.Ct. 1817. Under Discovery Network, that observation alone suffices to classify the expression as non-commercial.
 
 
 58
 Even were we to assume that Bolger 's bifurcated analysis survived Discovery Network and thus remained a viable approach to defining commercial speech, we would nonetheless be compelled to conclude that the expression contemplated by the Alaska laws is not mere commercial speech, but fully protected religious speech. None of the three factors outlined in Bolger is applicable here. The communications prohibited by the Alaska laws need not be presented as part of an "advertising format" to fall within the laws' scope. Nor would covered statements necessarily have to reference a "specific product." Finally--and, we think, most importantly--although a landlord seeking to rent an apartment would, almost by definition, possess an underlying "economic motive," it is religious conviction, not economics, that would cause Thomas or Baker (or any other similarly situated landlord) to make the inquiries, records, representations, or communications contemplated by the Alaska laws. Indeed, far from emanating from any pecuniary motive, a landlord's statement, "I prefer not to rent to unmarried couples," runs directly counter to his economic interests. A Christian landlord in Thomas and Baker's position has a distinct economic disincentive to speak up about his opposition to non-marital cohabitation. By expressing his beliefs, he runs the risk of losing a prospective tenant and leaving a vacant apartment unrented. When he speaks up anyway, he does so, not for economic reasons, but out of religious conviction. We recognize, of course, that the Bolger Court did not envision its decision as establishing a hard-and-fast formula for identifying non-core commercial speech; none of the factors is either necessary or sufficient to a determination that any given speech is "commercial." See Bolger, 463 U.S. at 67 & n. 14, 103 S.Ct. 2875. However, just as the Court in Bolger deemed the simultaneous presence of all three factors to be persuasive evidence that the speech there at issue was commercial in character, see id. at 67, 103 S.Ct. 2875, we believe that the simultaneous absence of all three is indicative of the non-commercial nature of the expression prohibited by the Alaska housing laws.
 
 
 59
 Consequently, whether under the narrow construction of commercial speech adopted in Virginia Pharmacy and recently endorsed in Discovery Network or the more permissive framework outlined in Bolger, we conclude that the expression targeted by the Alaska housing laws cannot be considered mere commercial speech. The simple fact is that not all speech which takes place in the context of a commercial transaction is "commercial speech."[12]
 
 
 60
 b
 
 
 61
 Here, the expression forbidden by the Alaska anti-discrimination laws is, at its essence, religious speech, which enjoys plenary First Amendment protection. See, e.g., Lamb's Chapel v. Center Moriches Union Free Sch. Dist., 508 U.S. 384, 393-94, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993). Moreover, there can be no doubt that both the Alaska statute and the Anchorage ordinance purport to regulate landlords' speech based upon its content. Under the laws, apartment owners and lessors are permitted to make inquiries, representations, and statements regarding some subjects, such as a prospective lessee's annual income, but not others, such as the lessee's marital status. "It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys." Rosenberger v. Rector & Visitors of the University of Virginia, 515 U.S. 819, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995) (citing Police Dep't of Chicago v. Mosley, 408 U.S. 92, 96, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972)). Indeed, content-based regulations of expression are presumed invalid under the First Amendment. See R.A.V. v. City of St. Paul, 505 U.S. 377, 382, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992).
 
 
 62
 Based upon the presumption of unconstitutionality that attaches to content-discriminatory laws of the sort at issue in this case, we believe that Thomas and Baker have made a colorable claim that the Alaska housing laws infringe their rights to free speech. The First Amendment thus serves to "hybridize" their Free Exercise challenge to §§ 18.80.240(3) and 18.80.240(5) of the Alaska statute and §§ 5.20.020(C), 5.20.020(E), and 5.20.020(G) of the Anchorage ordinance.
 
 V
 
 63
 Because we conclude that Thomas and Baker have successfully demonstrated hybrid-rights claims under the Takings and Free Speech Clauses, we must determine "whether government has placed a substantial burden on the observation of a central religious belief or practice and, if so, whether a compelling governmental interest justifies the burden." Hernandez v. Commissioner, 490 U.S. 680, 699, 109 S.Ct. 2136, 104 L.Ed.2d 766 (1989). We address the issues in turn. If the former question begets an affirmative response and the latter a negative, we must invalidate the Alaska laws insofar as they apply to Thomas and Baker and similarly situated landlords.
 
 
 64
 * With regard to the burden issue, Thomas and Baker argue that the laws present them with a Hobson's Choice of sorts between (1) violating their religious beliefs by renting to unmarried couples, (2) suffering punishment for refusing to rent to unmarrieds, and (3) forsaking their livelihoods as apartment owners altogether. That choice, they argue, renders the burden on their religious beliefs "substantial." Director Haley counters on two fronts. As an initial matter, she points out that "[t]he landlords' religion does not require them to rent housing"; rather, they do so "as a matter of choice for personal profit." She insists that "[t]he fact that the landlords' religious objection arises from regulation of their voluntary commercial activity renders any burden insubstantial." In support of her proposed prophylactic "commercial activity" exception to the substantial-burden rule, Haley relies upon United States v. Lee, 455 U.S. 252, 102 S.Ct. 1051, 71 L.Ed.2d 127 (1982), and Tony and Susan Alamo Foundation v. Secretary of Labor, 471 U.S. 290, 105 S.Ct. 1953, 85 L.Ed.2d 278 (1985). Most prominently, Haley points to the Lee Court's statement that
 
 
 65
 [w]hen followers of a particular sect enter into commercial activity as a matter of choice, the limits they accept on their own conduct as a matter of conscience and faith are not to be superimposed on the statutory schemes which are binding on others in the activity.
 
 
 66
 Lee, 455 U.S. at 261, 102 S.Ct. 1051. Contrary to Haley's suggestion, however, the Lee Court never intimated that the fact that a free exercise dispute arises in a "commercial" context might in and of itself affect the substantiality of the claimed burden. On the contrary, it expressly concluded that the government regulation there at issue--compulsory participation in the social security system--did "interfere[ ] with [the petitioners'] free exercise rights." Id. at 257, 102 S.Ct. 1051. Seemingly assuming that the burden was substantial, the Court then proceeded immediately to consider whether or not the government could save the law by demonstrating a compelling state interest in the maintenance of the challenged program. See id. at 257-58, 102 S.Ct. 1051. Concluding that it could, the Court rejected Lee's free exercise claim. See id. at 260, 102 S.Ct. 1051. The mere fact that the Court in Lee reached the compelling-interest issue (which is logically subsequent to the burden issue) confirms that it found a substantial burden.
 
 
 67
 Haley's reliance upon Alamo is similarly misplaced. She cites Alamo for the proposition that regulations which "apply only to commercial activities undertaken with a 'business purpose' " do not constitute constitutionally substantial burdens on free exercise. Alamo, 471 U.S. at 305, 105 S.Ct. 1953. The language that Haley recites, however, is taken, not from the portion of the opinion addressing the substantial-burden issue, but rather from a passage disposing of Establishment Clause challenges. Consequently, neither Lee nor Alamo supports a per se (or even presumptive) rule that burdens levied in commercial contexts are not constitutionally substantial. See Attorney General v. Desilets, 418 Mass. 316, 636 N.E.2d 233, 238 (Mass.1994) ("The fact that the defendants' free exercise of religion claim arises in a commercial context, although relevant when engaging in a balancing of interests, does not mean that their constitutional rights are not substantially burdened.").
 
 
 68
 Haley's second argument regarding the burden issue goes something like this: Thomas and Baker may avoid having either to compromise their religious beliefs or to face criminal penalties by simply "cashing out," that is, by selling their apartments and redeploying their capital in another investment; because the landlords retain that option, any burden on their religious rights is constitutionally insubstantial. To determine whether or not the Alaska laws at issue substantially burden Thomas and Baker's freedom of religion, we must "look[ ] to the degree that the government's requirement will, directly or indirectly, make the believer's religious duties more difficult or more costly." Laurence H. Tribe, American Constitutional Law § 14-12, at 1247 (2d ed.1988). This court has stated that, at a minimum, the interference with religious beliefs "must be more than an inconvenience." Graham v. Commissioner, 822 F.2d 844, 851 (9th Cir.1987), aff'd sub nom., Hernandez v. Commissioner, 490 U.S. 680, 109 S.Ct. 2136, 104 L.Ed.2d 766 (1989). In attempting to show that the burden on Thomas and Baker's religious exercise is nothing more than a simple inconvenience, Haley relies heavily upon Braunfeld v. Brown, 366 U.S. 599, 81 S.Ct. 1144, 6 L.Ed.2d 563 (1961). There, the Supreme Court rejected challenges to a Pennsylvania Sunday-closing law brought by Orthodox Jewish merchants. The storeowners claimed that, if they wished to exercise their religious beliefs by remaining closed to business on the Saturday sabbath, enforcement of the law would put them at a distinct economic disadvantage vis a vis their non-Sabbatarian competitors. The Court, however, refused their argument, stating that a governmental regulation that merely "operates so as to make the practice of [an individual's] religious beliefs more expensive" does not impose a sufficiently "substantial burden" to trigger Free Exercise Clause scrutiny. Id. at 605, 81 S.Ct. 1144.[13]
 
 
 69
 It is true that, because Thomas and Baker retain the cash-out option, the Alaska laws might not make their free exercise significantly "more expensive."[14] Expense, however, is not the sole consideration involved in determining whether a burden is constitutionally substantial or is instead merely "inconvenien[t]." See id. The burden imposed upon Thomas and Baker is qualitatively different--though we think no less severe--than an imposition of increased cost: The Alaska housing laws de facto banish both Thomas and Baker from the Alaska rental market altogether and force them to forsake their livelihoods as apartment owners and lessors. The laws do not effect a mere marginal reduction in business; they put Thomas and Baker out of business.
 
 
 70
 Moreover, Haley's "could have just quit" argument would seem equally applicable to the successful free exercise plaintiffs in the so-called "unemployment compensation cases," none of whom alleged that his respective religion required that he work for an employer whose business practices contravened his sincerely held religious beliefs. See Hobbie v. Unemployment Appeals Comm'n, 480 U.S. 136, 107 S.Ct. 1046, 94 L.Ed.2d 190 (1987); Thomas v. Review Board, 450 U.S. 707, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981); Sherbert v. Verner, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963). In none of those cases did the Court entertain--much less credit--the argument that the religious adherent could simply have left his job and have found an occupation that better suited his religious beliefs and practices. Rather, the Court's cases centered on a simple principle:
 
 
 71
 Where the state conditions receipt of an important benefit upon conduct proscribed by a religious faith, or where it denies such a benefit because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs, a burden on religion exists. While the compulsion may be indirect, the infringement upon free exercise is nonetheless substantial.
 
 
 72
 Hobbie, 480 U.S. at 141, 107 S.Ct. 1046 (quoting Thomas, 450 U.S at 717-18, 101 S.Ct. 1425). The same "substantial pressure" to modify behavior and to violate beliefs that was present in the unemployment compensation cases is at work here. The same Hobson's Choice that faced the employee-plaintiffs in those cases confronts Thomas and Baker.
 
 
 73
 Director Haley insists that the unemployment compensation cases are "inapplicable, because engaging in the rental business is not a government benefit," as is receiving welfare. Although we acknowledge a distinction between being deprived of unemployment "benefits" and being deprived of one's chosen occupation, it is hard to imagine why the distinction is one with a constitutional difference. Surely, one's statutory entitlement to government largesse holds no talismanic significance over and above one's interest in exercising his professional skills in his own way, such that the denial of the former triggers First Amendment scrutiny but the denial of the latter does not. Cf. Meyer v. Nebraska, 262 U.S. 390, 399, 43 S.Ct. 625, 67 L.Ed. 1042 (1923) ("[Fourteenth Amendment 'liberty'] denotes ... the right of the individual ... to engage in any of the common occupations in life."). In neither case, it would seem, is the pressure to conform decisively more "unmistakable." See Sherbert, 374 U.S. at 404, 83 S.Ct. 1790.
 
 
 74
 We thus conclude that the Alaska laws (and the trilemma of sorts they present) do "substantially burden" Thomas and Baker's religious rights.
 
 B
 
 75
 Of course, "[n]ot all burdens on religion are unconstitutional." Bowen v. Roy, 476 U.S. 693, 701, 106 S.Ct. 2147, 90 L.Ed.2d 735 (1986). Even substantial burdens on religious exercise may be justified by a showing that a regulation's restrictions are necessary to the achievement of some compelling state interest. Whether a compelling governmental interest justifies Alaska's anti-marital-status discrimination laws is the question to which we now turn.
 
 
 76
 The Supreme Court has provided some insight into the nature of the interests that are sufficiently "compelling" to survive strict Free Exercise Clause scrutiny. In Sherbert, for instance, the Court declared that, in order to restrict religious exercise, the State must advance "paramount interests." Sherbert, 374 U.S. at 406, 83 S.Ct. 1790 (quoting Thomas v. Collins, 323 U.S. 516, 530, 65 S.Ct. 315, 89 L.Ed. 430 (1945)). Likewise, in Yoder, the Court stated that it would defer only to "interests of the highest order." Yoder, 406 U.S. at 215, 92 S.Ct. 1526. Most recently, the Court in Lukumi reaffirmed that "[t]he compelling interest standard that we apply once a law fails to meet the Smith requirements is not 'water[ed] ... down' but 'really means what it says.' " Lukumi, 508 U.S. 520, 546, 113 S.Ct. 2217, 124 L.Ed.2d 472 (quoting Smith, 494 U.S. at 888, 110 S.Ct. 1595). Director Haley contends that the laws pass constitutional muster even under strict scrutiny because "Alaska has compelling interests in eradicating discrimination in housing on the basis of marital status." We disagree. Alaska's purported interest in preventing marital-status discrimination is simply not sufficiently "paramount" to satisfy strict scrutiny. See generally Swanner v. Anchorage Equal Rights Comm'n, 513 U.S. 979, 115 S.Ct. 460, 130 L.Ed.2d 368 (1994) (Thomas, J., dissenting from denial of certiorari).
 
 
 77
 Only twice has the Supreme Court recognized the prevention of discrimination as an interest compelling enough to justify restrictions on constitutional rights. In 1983, in Bob Jones University v. United States, 461 U.S. 574, 103 S.Ct. 2017, 76 L.Ed.2d 157 (1983), the Court concluded that there is an "overriding interest" in eradicating racial discrimination. Id. at 604, 103 S.Ct. 2017. A year later, in Roberts v. United States Jaycees, 468 U.S. 609, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984), the Court acknowledged a compelling government interest in preventing discrimination based upon gender. See id. at 623, 104 S.Ct. 3244. Although the Roberts Court was less than clear with respect to the precise considerations that led it to conclude that the elimination of gender discrimination constituted a compelling government interest, the Court in Bob Jones was more explicit: It based its decision upon what it deemed a "firm national policy" against race discrimination. Bob Jones, 461 U.S. at 593, 103 S.Ct. 2017. For support, the Court adverted to examples of anti-race-discrimination measures taken from all three branches of the federal government: In the judiciary, Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), and Cooper v. Aaron, 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5 (1958); in Congress, the Civil Rights Act of 1964, Pub.L. No. 88-352, 78 Stat. 241 (codified as amended at 42 U.S.C. §§ 1971, 1975a-1975d, 2000a-2000h6), the Civil Rights Act of 1968, Pub.L. No. 90-284, 82 Stat. 73 (codified as amended in scattered sections 18 U.S.C., 25 U.S.C., 28 U.S.C., and 42 U.S.C.), and the Voting Rights Act of 1965, Pub.L. No. 89-110, 79 Stat. 437 (codified as amended at 42 U.S.C. §§ 1971, 1973 to 1973gg-10); and in the executive branch, orders issued by Presidents Truman, Eisenhower, and Kennedy prohibiting racial discrimination in various sectors. Of course, had it opted to do so, the Bob Jones Court might easily have further elaborated, and cited as support for its "firm national policy" the Civil War and the Thirteenth, Fourteenth, and Fifteenth Amendments that followed on its heels. The post-Reconstruction history of this country leaves little room for argument as to the existence of a national commitment to the elimination of race discrimination.
 
 
 78
 It is beyond cavil that there is no similar "firm national policy" against marital-status discrimination. The Supreme Court has never accorded marital status any heightened scrutiny under the Equal Protection Clause, as it has both race, see, e.g., Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995), and gender, see, e.g., United States v. Virginia, 518 U.S. 515, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996). Nor has any court of appeals, for that matter. See Smith v. Shalala, 5 F.3d 235, 239 (7th Cir.1993) ("Because [a] classification based on marital status does not involve a suspect class and does not impact a fundamental interest, we must examine it under the rational basis test."); cf. United States v. Omoruyi, 7 F.3d 880, 881 (9th Cir.1993) ("Peremptory challenges based on marital status do not violate [Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) ]."). And although equal protection analysis may not be determinative of the compelling interest inquiry, it assuredly is not, as Director Haley claims, "irrelevant." The Equal Protection Clause is concerned more specifically than any other constitutional provision with the issue of discrimination; it is therefore eminently sensible to look to equal protection precedent as a proxy for the importance that attaches to the eradication of particular forms of discrimination. The fact that courts have not given unmarried couples any special consideration under the Equal Protection Clause is potent circumstantial evidence that society lacks a compelling governmental interest in the eradication of discrimination based upon marital status.
 
 
 79
 The Supreme Court's decision in Moore v. City of East Cleveland, 431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977), is also not insignificant in determining whether a "firm national policy" against marital-status discrimination exists. There, the Court considered a substantive due process challenge to a local housing ordinance that limited dwelling occupancy to single families. The ordinance defined "family" in such a manner as to exclude from its scope a woman living with her son and two grandsons. See id. at 496 & n. 2, 97 S.Ct. 1932. The City argued to the Court that its earlier decision in Belle Terre v. Boraas, 416 U.S. 1, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974), required it to uphold the ordinance. In Belle Terre, the Court had upheld against constitutional challenge another city's single-family-dwelling ordinance. The Moore Court, however, easily distinguished its earlier holding:
 
 
 80
 [O]ne overriding factor sets this case apart from Belle Terre. The ordinance there affected only unrelated individuals. It expressly allowed all who were related by "blood, adoption, or marriage" to live together, and in sustaining the ordinance we were careful to note that it promoted "family needs" and "family values."
 
 
 81
 Id. at 498, 97 S.Ct. 1932. The Supreme Court has, therefore, for all intents and purposes, recognized a substantive due process right to live with relatives (such as spouses), but has expressly declined to extend such a right to "unrelated" individuals (such as unmarried cohabitants). Hence, far from articulating any constitutional policy against marital-status discrimination, the Supreme Court has itself approved regulations containing distinctions between married and unmarried couples, bestowing upon the former rights it withholds from the latter.[15]
 
 
 82
 Nor do congressional enactments evince any discernible legislative policy against marital-status discrimination. Significantly, the federal statute most analogous to the Alaska laws here at issue, the Fair Housing Act, 42 U.S.C. § 3601-3631, makes no mention whatsoever of "marital status" among its catalogue of six protected categories. See, e.g., id. § 3604(a) ("[I]t shall be unlawful ... [t]o refuse to sell or rent ... a dwelling to any person because of race, color, religion, sex, familial status, or national origin."[16] ). Indeed, the overwhelming majority of federal civil rights laws are silent on the issue of marital-status discrimination. See, e.g., 42 U.S.C. § 2000a(a) (prohibiting discrimination in places of public accommodation "on the ground of race, color, religion, or national origin"); 42 U.S.C. § 2000d (prohibiting discrimination in any federally funded program "on the ground of race, color, or national origin"); 42 U.S.C. § 2000e-2(a) (prohibiting discrimination in employment "because of [an] individual's race, color, religion, sex, or national origin"). Similarly, whereas the Sentencing Guidelines authorize penalty enhancements for defendants who select their victims based upon "race, color, religion, national origin, ethnicity, gender, disability, or sexual orientation," they make no mention of marital status. U.S.S.G. § 3A1.1(a). To be sure, there are a handful of federal statutes that do forbid marital-status discrimination. See 5 U.S.C. § 2301(b)(2); 15 U.S.C. § 1691(a); 20 U.S.C. § 1071(a)(2). A "handful," however, do not a "firm national policy" make.
 
 
 83
 Alaska law is likewise unavailing. As an initial matter, we think it strange to reference Alaska law (in isolation) as evidence of a compelling government interest in eradicating marital status discrimination. Alaska law certainly cannot alone suffice to demonstrate a "firm national policy." Nor, would it seem, can a single state 's law evince--under any standard--a compelling government interest for federal constitutional purposes. The fact that Alaska has granted its citizens a "civil right" to "obtain ... housing accommodations ... without discrimination because of ... marital status," see Alaska Stat. § 18.80.210, is irrelevant. Surely there are other states that are less enthusiastic. Under Director Haley's reasoning, presumably Alaska would possess a compelling interest in eradicating marital-status discrimination but, say, Alabama, would not. Under such a state-specific approach to identifying compelling interests, all fields of federal constitutional law in which courts employ strict scrutiny--including free speech, free exercise, equal protection, and substantive due process--would be balkanized beyond the point of recognition. States could unilaterally "opt out" of federal constitutional rules (the Free Exercise Clause among them) simply by adopting particular legislative policies. Coherent constitutional doctrines would no longer exist; rather, we would be subjected to fifty individual sub-constitutions, each according the government a slightly different degree of authority to infringe constitutional rights.
 
 
 84
 Even were we to assume that state law could alone suffice to create a compelling governmental interest in preventing discrimination against unmarried couples, Alaska's would not meet this constitutional test. For example, the very laws under review contain exceptions for "married-only" housing, see Alaska Stat. § 18.80.240, and for space rented in the home of the landlord, see Anchorage Mun.Code § 5.20.020. Moreover, as Justice Moore observed in his dissent in Swanner, Alaska law expressly discriminates against unmarried couples in a number of contexts:
 
 
 85
 [T]he government itself discriminates based on marital status in numerous regards, and there is no suggestion that this practice should be reexamined. Alaska law explicitly sanctions such discrimination. See, e.g., AS 13.11.015 (intestate succession does not benefit unmarried partner of decedent); AS 23.30.215(a) (workers' compensation death benefits only for surviving spouse, child, parent, grandchild, or sibling); Alaska R. Evid. 505 (no marital communication privilege between unmarried couples); Serradell v. Hartford Accident & Indemn. Co., 843 P.2d, 639, 641 (Alaska 1992) (no insurance coverage for unmarried partner under family accident insurance policy).
 
 
 86
 Swanner, 874 P.2d at 288-89. Alaska's "underenforcement" of its purported interest in eradicating marital-status discrimination is critical, because "[i]t is established in ... strict scrutiny jurisprudence that 'a law cannot be regarded as protecting an interest "of the highest order" ... when it leaves appreciable damage to that supposedly vital interest unprohibited.' " Lukumi, 508 U.S. at 547, 113 S.Ct. 2217 (quoting Florida Star v. B.J.F., 491 U.S. 524, 541-42, 109 S.Ct. 2603, 105 L.Ed.2d 443 (1989) (Scalia, J. concurring in part and concurring in judgment)).
 
 
 87
 There is simply no support from any quarter for recognizing a compelling government interest in eradicating marital-status discrimination that would excuse what would otherwise be a violation of the Free Exercise Clause. Not all discrimination is created equal.
 
 VI
 
 88
 Having satisfied ourselves that Thomas and Baker have successfully demonstrated hybrid-rights claims within the meaning of Smith, that the Alaska housing laws substantially burden free exercise rights, and that the laws are not justified by any compelling government interest, we must lastly determine whether there is any independent bar to granting the landlords an exemption from the laws under the Free Exercise Clause. AERC insists that there is such a bar: The Establishment Clause.[17] Specifically, AERC argues that exemptions granted under the Free Exercise Clause violate the Establishment Clause "where the conduct sought to be protected by the Free Exercise Clause would result in direct injury to other identifiable persons."
 
 
 89
 Obviously, Free Exercise Clause exemptions do not as a general matter violate the Establishment Clause. See Hobbie, 480 U.S. at 144-45, 107 S.Ct. 1046 ("This Court has long recognized that the government may (and sometimes must) accommodate religious practices and that it may do so without violating the Establishment Clause."). If they did, then Yoder, Sherbert, Hobbie, Thomas, and Lukumi (to name just a few cases in which the Court granted exemptions under the Free Exercise Clause) would have been decided differently. Although recent Establishment Clause doctrine undoubtedly suffers from a sort of jurisprudential schizophrenia, we are not altogether without guidance in evaluating Establishment Clause challenges. Pursuant to the oft-criticized-but-still-extant three-prong standard of Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), government action violates the Establishment Clause only if (1) it does not have a "secular legislative purpose," or (2) its "principal or primary effect" is to advance or inhibit religion, or (3) it fosters an "excessive government entanglement" with religion. Id. at 612-13, 91 S.Ct. 2105. Similarly, under the so-called "endorsement" test, courts look to "whether the challenged governmental practice either has the purpose or effect of 'endorsing' religion." County of Allegheny v. ACLU, 492 U.S. 573, 592, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989). AERC has not so much as alleged that, by granting Thomas and Baker a constitutionally mandated exemption from the Alaska housing laws, we run the risk of "endorsing" Christianity or unnecessarily "entangling" the government in religious affairs.
 
 
 90
 The fact that the exemption might, if granted, result in harm to third parties does not materially affect the Establishment Clause calculus. Establishment Clause jurisprudence concerns itself with only one kind of "harm": the stigmatization of religious minorities. See Lynch v. Donnelly, 465 U.S. 668, 688, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984) (O'Connor, J. concurring) ("Endorsement sends a message to nonadherents that they are outsiders, not full members of the political community."); see also Sherbert, 374 U.S. at 409, 83 S.Ct. 1790 (inquiring whether recognition of employee's right to unemployment compensation benefits would "serve to abridge any other person's religious liberties"). Here, the only palpable injury suffered by an unmarried tenant turned away by a Christian landlord for religious reasons is a marginal reduction in the number of apartment units available for rent. The "harm" to the rejected lessee, if any, is economic, not religious; as such, it is beyond the pale of the Establishment Clause.
 
 
 91
 By exempting Thomas and Baker from the scope of the Alaska anti-marital-discrimination laws, we do not "establish" or otherwise endorse Christianity as an official state religion. Rather, our opinion "reflects nothing more than the governmental obligation of neutrality in the face of religious differences." Sherbert, 374 U.S. at 409, 83 S.Ct. 1790. The Establishment Clause does not forbid what the Free Exercise Clause requires.
 
 VII
 
 92
 Noble as their purpose may be, neither the Alaska statute nor the Anchorage ordinance may be enforced against landlords, like Thomas and Baker, who for religious reasons refuse to rent to unmarried couples.
 
 The decision of the district court is
 
 93
 AFFIRMED.
 
 
 94
 MICHAEL DALY HAWKINS, Circuit Judge, dissenting:
 
 
 95
 The approach of the majority ought to alarm any serious student of judicial restraint. It decides a controversy that does not exist, in favor of parties who have suffered no harm and turns on its head the notion that state and local laws of general and uniform application are entitled to substantial deference. Tossed aside in the process is a statutory provision that has been widely upheld--in the face of challenges far more firmly grounded in fact and law than this--by state supreme courts throughout our circuit. See Smith v. Fair Employment and Housing Comm'n, 12 Cal.4th 1143, 51 Cal.Rptr.2d 700, 913 P.2d 909 (1996), cert. denied, --- U.S. ----, 117 S.Ct. 2531, 138 L.Ed.2d 1031 (1997); Swanner v. Anchorage Equal Rights Comm'n, 874 P.2d 274 (Alaska), cert. denied, 513 U.S. 979, 115 S.Ct. 460, 130 L.Ed.2d 368 (1994).
 
 
 96
 Thomas & Baker seek a declaration that an Alaska statute and a companion Anchorage Ordinance are unconstitutional because they offend their religious belief that unmarried persons should not cohabitate. Thomas & Baker claim to have violated these laws in the past by refusing to rent to unmarried couples; yet they cannot provide the name of a single prospective tenant turned away for this reason. Until they filed this lawsuit, the principal agency responsible for enforcement of these measures had never even heard of them and for good reason: no one has ever filed a complaint about their rental practices. Thomas & Baker claim to be in "grave danger" of having these laws enforced against them, yet they can point to a grand total of two prosecutions in the more than twenty years since these measures have been on the books. The record is devoid of any suggestion that either Thomas or Baker has ever spoken out publicly about these laws, written a letter to any editor or even so much as shouted out in the dark of night about their impact on them.
 
 
 97
 Not only is there no reasonable threat of prosecution under these facts, Thomas & Baker have failed to show that the issues they raise are ripe for judicial decision. Ripeness is not a doctrine of convenience, something to be tossed aside when the merits of a case seem attractive. It is a serious doctrine of restraint that tells us when we should keep our powder dry and our noses out of controversies not ready to be decided. Applied to the remarkably thin facts of this case, the doctrine would require these landlords to demonstrate how, on the record before us, there are adequate facts upon which we might conduct an effective review of their claim. Thomas & Baker simply have not met this burden.
 
 
 98
 In an effort to shore up this remarkably vacuous record, the majority elects to take judicial notice of a matter entirely outside the record of this appeal, an event in an Alaska administrative proceeding that, even though of public record while this matter was being briefed, was never mentioned by the parties seeking to take advantage of it until after this appeal was argued.[1]
 
 
 99
 Here, too, the majority simply ignores all prior teaching concerning restraint in such matters. Absent extraordinary circumstances, a reviewing court cannot supplement the record on appeal with material not before the district court. See Reebok Int'l, Ltd. v. Marnatech Enterprises, Inc., 970 F.2d 552, 556 n. 5 (9th Cir.1992); Barilla v. Ervin, 886 F.2d 1514, 1521 n. 7 (9th Cir.1989).
 
 
 100
 There are certainly occasions when it is entirely proper for an appellate court to "notice a doctrine or rule of law from such prior case and apply that principle under the theory of stare decisis." M/V American Queen v. San Diego Marine Construction Corp., 708 F.2d 1483, 1491 (9th Cir.1983). It is equally appropriate to take judicial notice of a court's "own records in other cases, as well as the records of an inferior court in other cases." United States v. Wilson, 631 F.2d 118, 119-20 (9th Cir.1980); see also Zolg v. Kelly III, 841 F.2d 908, 911 n. 1 (9th Cir.1988) (judicial notice of earlier state court memorandum opinion setting forth facts and issues); Bryant v. Carleson, 444 F.2d 353, 357-58 (9th Cir.1971) (judicial notice of developments occurring in same case since taking of appeal). Nevertheless, "a court may not take judicial notice of proceedings or records in another cause so as to supply, without formal introduction of evidence, facts essential to support a contention in a cause then before it." M/V American Queen, 708 F.2d at 1491.
 
 
 101
 Here the majority takes notice of an administrative complaint and answer filed with the Alaska State Commission For Human Rights ("ASCHR"). Whatever these documents are, they are certainly not "generally known" nor are the allegations contained in them "capable of an accurate" and "ready determination" by an unimpeachable source. The documents are not only not part of any court proceeding of any kind, we do not know whether the ASCHR has held any hearing or issued any order or decision on the matter. In fact, this event occurred nearly two years ago and there is no evidence that any enforcement action was ever pursued or that the proceedings are in any way ongoing. Moreover, the complaint of a student at a private religious school concerning her possible eviction from married student housing bears little if any resemblance to the issues presented here.
 
 
 102
 Even if these concerns could somehow be overcome, taking judicial notice after briefing and argument--even though plainly available before either--violates basic notions of procedural fairness. See, e.g., United States v. Camp, 723 F.2d 741, 744 n.** (9th Cir.1984) (adverse party entitled to opportunity to be heard as to the propriety of taking judicial notice and the tenor of the matter noticed). These matters were apparently filed with the ASCHR on February 3, 1997, after the district court entered its decision on January 28, 1997. Thomas & Baker filed their notice of appeal on February 26, 1997, yet waited until July 28, 1998, long after briefing had closed and after argument of this appeal, to request judicial notice of the events in the ASCHR action. We should never sanction such dilatory tactics and we should certainly not rely on them to bolster the argument that this matter is somehow ripe for judicial review.
 
 I. Ripeness
 
 103
 We have long followed a straightforward test to determine when a case is ripe for review. A case is ripe "when all the essential facts establishing the right to declaratory relief have already occurred." Wickland Oil Terminals v. Asarco, Inc., 792 F.2d 887, 893 (9th Cir.1986). The ripeness doctrine contains both a constitutional and a prudential component. See Portman v. County of Santa Clara, 995 F.2d 898, 902 (9th Cir.1993).
 
 
 104
 The constitutional component requires that "there be a 'substantial controversy ... of sufficient immediacy and reality to warrant the issuance of a declaratory judgment,' " and is closely tied to standing requirements.[2] Aydin Corp. v. Union of India, 940 F.2d 527, 528 (9th Cir.1991) (quoting Maryland Casualty Co. v. Pacific Coal & Oil Co., 312 U.S. 270, 273, 61 S.Ct. 510, 85 L.Ed. 826 (1941)). Under this standard, Thomas & Baker " 'must demonstrate a realistic danger of sustaining a direct' " and immediate injury. Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289, 298, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979) (citation omitted); see also Bland v. Fessler, 88 F.3d 729, 736 (9th Cir.1996).
 
 
 105
 Several factors determine whether a party has met this burden. For instance, a plaintiff must establish a "concrete plan" to violate the law. See San Diego County Gun Rights Committee v. Reno, 98 F.3d 1121, 1126-27 (9th Cir.1996). While Thomas & Baker maintain they have and will continue to violate the laws by refusing to rent to unmarried cohabitants, the record discloses not a scrap of supporting evidence. Neither can point to a single prospective tenant they have turned away on account of marital status and no complaint has ever been filed against either of them. Thomas has been a residential landlord since 1986 and yet not one person allegedly refused housing by him has ever seen fit to file a complaint.
 
 
 106
 Beyond a concrete plan to violate these laws, Thomas & Baker have failed to show a specific threat of prosecution. " 'The mere existence of a statute, which may or may not ever be applied to plaintiffs, is not sufficient to create a case or controversy within the meaning of Article III.' " Id. at 1126 (quoting Stoianoff v. Montana, 695 F.2d 1214, 1223 (9th Cir.1983)). Thomas & Baker bear the burden of showing a threat by the government to prosecute them; a "general threat of prosecution is not enough." See San Diego County Gun Rights Committee, 98 F.3d at 1126-27; see also Stoianoff, 695 F.2d at 1223 ("[A] plaintiff must demonstrate a genuine threat that the allegedly unconstitutional law is about to be enforced against him.").
 
 
 107
 Here, the Alaska State Commission on Human Rights--the principal enforcement agency--had never even heard of Thomas or Baker before the instant action. As Thomas & Baker both admit, no state or local agency has ever threatened or brought any action against them in the past nor is any action currently pending. While " 'one does not have to await the consummation of a threatened injury to obtain preventive relief ... the injury [must be] certainly impending.' " Babbitt, 442 U.S. at 298. There is simply no proof of the existence of a credible threat of prosecution here.[3]
 
 
 108
 The history of past prosecution is a relevant factor in assessing whether such a "realistic threat" exists. See San Diego County Gun Rights Committee, 98 F.3d at 1128; Adult Video Ass'n. v. Barr, 960 F.2d 781, 785 (9th Cir.1992), rev'd on other grounds, 509 U.S. 917, 113 S.Ct. 3028, 125 L.Ed.2d 716 (1993), opinion adopted in part, 41 F.3d 503 (9th Cir.1994). While not dispositive, the government's willingness to use a challenged statute is inextricably intertwined with an assessment of whether plaintiffs face a "genuine threat of prosecution." See San Diego County Gun Rights Committee, 98 F.3d at 1128. Here, the Alaska statute was enacted in 1975 and the Anchorage ordinance adopted in 1976. See Foreman v. Anchorage Equal Rights Comm'n., 779 P.2d 1199, 1202 (Alaska 1989). In 1976, the Alaska Supreme Court interpreted the statute as an affirmative mandate. See Hotel, Motel, Restaurant, Construction Camp Employees & Bartenders Union v. Thomas, 551 P.2d 942, 945 (Alaska 1976). In the 22 years since that decision, however, the record reveals a grand total of two actions against parties based on complaints of marital status discrimination and only one of those cases involved a party similarly situated to Thomas & Baker. See Swanner, 874 P.2d at 274; Foreman, 779 P.2d at 1199. The record of enforcement undermines the claim that Thomas & Baker face a "real and immediate" threat of prosecution.[4]
 
 
 109
 On this point, the majority's quest to find Thomas & Baker's claims justiciable, results in a mischaracterization of case law. In San Francisco County Democratic Central Comm. v. Eu, 826 F.2d 814, 822 (9th Cir.1987), this court found the claims at issue justiciable, in part, because "notwithstanding a record of non-enforcement ... the record did not show that the statutes had been 'commonly and notoriously' violated." Indeed, "plaintiffs' uncontroverted affidavits show[ed] that they [had] consistently, if reluctantly, obeyed the statute."[5] Thus, in Eu, non-enforcement of the statute was of no import because an enforcement action would only be triggered in response to a violation. Consequently, the record of non-enforcement revealed nothing about whether there was a "realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement." Id. at 821.
 
 
 110
 Here, however, non-enforcement of the anti-discrimination statute is relevant to whether Thomas & Baker face a "credible threat of prosecution." See Darring v. Kincheloe, 783 F.2d 874, 877 (9th Cir.1986). Unlike the plaintiffs in Eu, Thomas & Baker claim to have violated the anti-discrimination laws for over a decade; yet there has never been so much as a threat of enforcement against them. While the majority attempts to minimize Thomas & Baker's actions, their continued violation of the laws strongly suggests that these laws are in fact "commonly and notoriously" violated.[6] Thus, a lack of enforcement for over twenty years in the face of repeated violations distinguishes Eu and undercuts Thomas & Baker's claim that their fear of prosecution is more than speculative. See Darring, 783 F.2d at 877.[7]
 
 
 111
 To determine whether Thomas & Baker's claims are ripe, moreover, requires evaluating the two prudential components: "(1) whether the issues are fit for judicial determination, and (2) whether the parties will suffer hardship if [the court] declines to consider these issues." San Diego County Gun Rights Committee, 98 F.3d at 1132; see also Lee v. Oregon, 107 F.3d 1382, 1391 (9th Cir.1997).
 
 
 112
 On the second of these factors--whether Thomas & Baker will suffer a hardship if jurisdiction were declined--the majority is strangely silent. Our case law is clear, however, that the threat of a criminal penalty must be real and specific. See Freedom to Travel Campaign v. Newcomb, 82 F.3d 1431, 1435 (9th Cir.1996). Where, as here, there is no threat of criminal prosecution--specific or otherwise--we must decline to exercise jurisdiction. See San Diego County Gun Rights Committee, 98 F.3d at 1132-33. This is particularly true where delayed resolution of the issues would not foreclose relief. See American-Arab Anti-Discrimination Comm., 970 F.2d at 511-12, (quoting Duke Power Co. v. Carolina Envt'l. Study Group, 438 U.S. 59, 82, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978)).
 
 
 113
 Thus, where there is an adequate opportunity and procedures are available to raise such claims--as would exist in the face of an actual enforcement action--the mere potential for criminal or civil action is not considered a sufficient hardship. See Lee, 107 F.3d at 1391-92 (hardship insufficient where actual--not intended--noncompliance would produce an enforcement action where validity of statute could be challenged); San Diego County Gun Rights Committee, 98 F.3d at 1133 (opportunity to raise constitutional objections if and when criminal prosecution initiated); American-Arab Anti-Discrimination Comm., 970 F.2d at 512 (exercise of jurisdiction prior to enforcement premature).
 
 
 114
 Not only is it highly questionable whether Thomas or Baker face a "specific threat" of any kind of enforcement action, a violation of the Alaska statute is a misdemeanor. Alaska Stat. § 18.80.270. And the law most likely to be enforced here, Anchorage Municipal Code, tit.5, § 30, provides no specific penalty at all for violations. At most, Thomas & Baker would be subject to a compliance order. To the extent a compliance order could even be described as a penalty, it is of a wholly different magnitude than the sanction at risk in cases where we have declined jurisdiction. See San Diego County Gun Rights Committee, 98 F.3d at 1124 (felony weapons charges); American-Arab Anti-Discrimination Comm., 970 F.2d at 511-12 (deportation).
 
 
 115
 Finally, Thomas & Baker will have ample opportunity to raise their constitutional challenges in the event that the Alaska statute or Anchorage ordinance is actually enforced against them. See Swanner, 874 P.2d at 274. Thomas & Baker plainly fail to establish sufficient hardship to justify our exercise of jurisdiction.
 
 
 116
 II. The Hybrid-Rights "Exception"
 
 
 117
 The majority result has it that the First Amendment bars the application of a neutral, generally applicable law to religiously motivated actions.[8] This notion arises out of language in Employment Div., Dept. of Human Resources of Oregon v. Smith, 494 U.S. 872, 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1989). But Smith provides no refuge:
 
 
 118
 The only decisions in which we have held that the First Amendment bars application of a neutral, generally applicable law to religiously motivated action have involved not the Free Exercise Clause alone, but the Free Exercise Clause in conjunction with other constitutional protections, such as freedom of speech or of the press.
 
 
 119
 494 U.S. at 881, 110 S.Ct. 1595 (citations omitted). First, there is real doubt whether the hybrid-rights exception even exists. The Supreme Court was less than clear in outlining the nature and consequences of such an exception. See id. at 881-88, 110 S.Ct. 1595. While a number of circuits (including our own) have implicitly recognized such an exception, the Supreme Court itself has never explicitly held that it exists. See Swanson v. Guthrie Indep. School Dist. No. I-L, 135 F.3d 694 (10th Cir.1998); Equal Employment Opp. Comm'n v. Catholic Univ. of America, 83 F.3d 455 (D.C.Cir.1996); American Friends Serv. Comm. Corp. v. Thornburgh, 961 F.2d 1405 (9th Cir.1991); Cornerstone Bible Church v. City of Hastings, 948 F.2d 464 (8th Cir.1991).
 
 
 120
 The Supreme Court's precise holding in Smith is that "the right of free exercise does not relieve an individual of the obligation to comply with a 'valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes).' " 494 U.S. at 879, 110 S.Ct. 1595. After alluding to the possibility of a hybrid-rights exception, Smith states: "[t]he present case does not present such a hybrid situation." Id. at 882, 110 S.Ct. 1595. Thus, because Smith itself was not a hybrid-rights case, the paragraph in Smith purporting to carve out a hybrid-rights exception is dicta; simply an attempt to distinguish other free exercise cases from the facts in Smith.
 
 
 121
 Although the majority is correct that this panel must follow American Friends, it is simply wrong to characterize the Sixth Circuit's approach as "ignoring" the hybrid-rights exception. The Sixth Circuit did not ignore Smith, but instead found that "the Smith court did not explain how the standard under the Free Exercise Clause would change depending on whether other constitutional rights were implicated." Kissinger v. Board of Trustees of the Ohio State Univ., College of Veterinary Medicine, 5 F.3d 177, 180 (6th Cir.1993). Then, the court determined that "until the Supreme Court holds that legal standards under the Free Exercise Clause vary depending on whether other constitutional rights are implicated, we will not use a stricter legal standard than that used in Smith to evaluate a generally applicable, exceptionless state regulation under the Free Exercise Clause." Id. This would appear to be the soundest approach and the one most consistent with principles of judicial restraint. A court need not address the cases Smith did not overrule (the hybrid-rights cases) unless or until a parallel case is presented. Here, each of these cases[9] identified in Smith as possible hybrid-rights matters can be readily distinguished from this case and limited to their facts.[10] Given the uncertainty in this area, the Sixth Circuit's approach is quite prudent.
 
 
 122
 Were we compelled to reach the merits here, our prior decision in American Friends would make it necessary to define precisely what the Supreme Court meant in Smith when it referred to the notion of a hybrid-rights exception. The D.C. and First Circuits adopt a view that a proper hybrid-rights claim would have to be one that is "independently viable." Catholic Univ. of America, 83 F.3d at 467; Brown v. Hot, Sexy, and Safer Prod., 68 F.3d 525, 539 (1st Cir.1995). Such an approach necessarily requires that the companion claim be one capable of carrying its own weight. As will be seen from the discussion below, Thomas & Baker simply cannot meet such a requirement.
 
 
 123
 Nor does the majority opinion help fit Thomas & Baker's claim within Smith 's hybrid-rights umbrella. The majority's reliance on Swanson is unavailing. There the Tenth Circuit embraced a "colorable claim" approach. A careful reading of Swanson, however, suggests that the Tenth Circuit has yet to affirmatively embrace a particular reading of Smith. See Swanson, 135 F.3d at 700 ("Whatever the Smith hybrid-rights theory may ultimately mean, we believe that it at least requires a colorable showing of infringement of recognized and specific constitutional rights").
 
 
 124
 Nor is there support in the case law for the majority's application of strict scrutiny to hybrid-rights cases. As the Sixth Circuit noted, the Supreme Court in Smith did not announce a different test for hybrid-rights cases. See Kissinger, 5 F.3d at 180. Even the cases which the Supreme Court cited as involving "hybrid rights" did not explicitly refer to or invoke strict scrutiny or a compelling government interest test. In Boerne v. Flores, 521 U.S. 507, 117 S.Ct. 2157, 2161, 138 L.Ed.2d 624 (1997), the Court observed that "the only instances where a neutral, generally applicable law had failed to pass constitutional muster ... were cases in which other constitutional protections were at issue." Thus, the Court in no way embraced the application of strict scrutiny for such cases. Moreover, the majority's reliance on the line of cases employing the test outlined in Thomas v. Review Board, 450 U.S. 707, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981) is seriously misplaced. The Supreme Court in Smith specifically stated that "[w]e have never invalidated any governmental action on the basis of the Sherbert test except the denial of unemployment compensation.... In recent years we have abstained from applying the Sherbert test (outside the unemployment compensation field) at all." 494 U.S. at 884, 110 S.Ct. 1595; see also Swanson, 135 F.3d at 701.
 
 III. Fifth Amendment Takings Claim
 
 125
 The majority's opinion that Thomas & Baker present a colorable Fifth Amendment Takings claim suffers from a host of fatal flaws. First, Thomas & Baker do not have standing to assert a Fifth Amendment Takings claim. It is well settled that the right to exclude is ordinarily among a property owner's "bundle of rights." See PruneYard Shopping Center v. Robins, 447 U.S. 74, 82, 100 S.Ct. 2035, 64 L.Ed.2d 741 (1980); Kaiser Aetna v. United States, 444 U.S. 164, 179-80, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979). Under this theory, an individual's property rights are defined by the bundle of rights acquired when title to the property is obtained. See Lucas v. South Carolina Coastal Council, 505 U.S. 1003, 1027-28, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992); see also M & J Coal Co. v. United States, 30 Fed. Cl. 360, 367 (1994) ("[I]f at the time of sale an existing law or regulation precludes a certain use, that use was never a 'stick' in the purchaser's 'bundle of rights.' "). This court has held that if a property owner does not own property at the time a statute is enacted and the taking occurs, no injury sufficient to make a facial constitutional challenge exists. See Hoeck v. City of Portland, 57 F.3d 781, 788-89 (9th Cir.1995); Carson Harbor Village Ltd. v. City of Carson, 37 F.3d 468, 476 (9th Cir.1994) overruled on other grounds, WMX Tech., Inc. v. Miller, 104 F.3d 1133 (9th Cir.1997); see also Lucas, 505 U.S. at 1027-28, 112 S.Ct. 2886 ("[T]he State ... may resist compensation only if ... the nature of the owner's estate shows that the proscribed use interests were not part of his title to begin with.").
 
 
 126
 Here, the statute was passed in 1975 and enacted in 1976. Thomas did not enter the residential landlord business until 1986.[11] The law charges Thomas with knowledge of the anti-discrimination restrictions placed on his bundle of property rights at the time he entered the rental market. Therefore, at the time he embarked on this business venture and acquired his residential properties, his bundle of property rights did not include the right to exclude potential tenants on the basis of marital status. Since Thomas never obtained an absolute, unqualified right to exclude others from his property, he cannot now complain that this "stick" was taken. Consequently, he has not suffered injury and as such lacks standing to bring this challenge.
 
 
 127
 Second, the majority opinion mistakenly relies on Supreme Court cases involving actual, physical takings.[12] For example, the Supreme Court's decision in Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982), stands for the straightforward proposition that any physical invasion, whether it increases or decreases the economic value of the owner's property, constitutes a taking that requires compensation. Loretto addresses issues squarely within the area of physical takings, not regulatory taking which is at issue here. More importantly, Loretto explicitly recognizes that its holding would not affect the State's ability to regulate and adjust the landlord-tenant relationship. See id. at 440, 102 S.Ct. 3164 ("This Court has consistently affirmed that States have broad power to regulate housing conditions in general and the landlord-tenant relationship in particular without paying compensation for all economic injuries that such regulation entails.") (emphasis added). Moreover, in Phillips v. Washington Legal Found., 524 U.S. 156, ----, 118 S.Ct. 1925, 1933, 141 L.Ed.2d 174 (1998), the sole question before the Court was whether the item at issue constituted property. Thus, the Court's statement that "property is more than economic value" simply went to underscore that point. It was not presented as an alternative method of assessing whether the State has taken the property, the issue presented here.
 
 
 128
 Finally, the theme consistently attending the regulatory takings cases is that the government action deprived the property owner of investment-backed expectations.[13] Indeed, the very heart of the regulatory takings doctrine is that the regulation has gone "too far" by depriving the owner of the "economically beneficial and productive use of land." Lucas, 505 U.S. at 1015, 112 S.Ct. 2886. Here, the Alaska statute does not adversely impact the economic interests of someone in Thomas's shoes who entered the residential rental market with full knowledge of the restraints on his right to exclude. Thus, it cannot be said that Thomas has been the victim of a government taking.
 
 IV. First Amendment Free Speech
 
 129
 In assessing the viability of Thomas & Baker's free speech claim, the majority unnecessarily meanders through the minefields of current commercial speech doctrine, ultimately reaching the remarkable conclusion that "the expression forbidden by the Alaska anti-discrimination laws is, at its essence, religious speech." (Majority Opinion at 711). This reasoning suffers from two basic problems: (1) it is at odds with all established precedent; and (2) it runs afoul of even the most basic notions of protected religious expression.
 
 
 130
 The distinction between commercial and noncommercial speech is the subject of significant constitutional debate. One thing is clear, however: under the Supreme Court's current jurisprudence, commercial speech is afforded a lesser degree of protection from governmental regulation than some other forms of expression. See United Reporting Publishing Corp. v. California Highway Patrol, 146 F.3d 1133, 1136 (9th Cir.1998).
 
 
 131
 But what constitutes commercial speech? To be sure, no mathematical formula distinguishes commercial from noncommercial speech. Id. at 1137. Nevertheless, the majority's characterization of commercial speech is just plain wrongheaded. Despite the uncertainty created by City of Cincinnati v. Discovery Network, Inc., 507 U.S. 410, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993), the Supreme Court has refused to explicitly reject the doctrine. Moreover, the Court has yet to limit the parameters of commercial speech to "speech that does nothing more than propose a commercial transaction." Id. at 421, 113 S.Ct. 1505. A close reading of Discovery Network inextricably leads to the conclusion that the Court's discussion on this point is dicta. Id. at 416, 424, 113 S.Ct. 1505.[14]
 
 
 132
 The majority's interpretation of Bolger v. Youngs Drug Prods. Corp., 463 U.S. 60, 67, 103 S.Ct. 2875, 77 L.Ed.2d 469 (1983), is equally suspect. While Bolger provides something of a framework for discerning commercial from noncommercial speech, it is only a partial roadmap. The Bolger indicators are not dispositive. See id. at 68 n. 14, 103 S.Ct. 2875. Critical to this analysis is a common sense evaluation of the context in which the speech occurs. See Ohralik v. Ohio State Bar Assoc., 436 U.S. 447, 455-56, 98 S.Ct. 1912, 56 L.Ed.2d 444 (1978) ("We have not discarded the 'common-sense' distinction between speech proposing a commercial transaction ... and other varieties of speech."); United Reporting Publishing Corp., 146 F.3d at 1137 ("[W]e must examine the disputed communication in light of its surrounding circumstances."). The majority's opinion is devoid of such an examination.
 
 
 133
 Notwithstanding the seeming inapplicability of the Bolger factors, a common sense analysis strongly suggests that these anti-discrimination laws do not proscribe speech beyond that directly associated with a commercial transaction--the rental of real property. Indeed, canons of statutory construction counsel against the literal, acontextual reading urged by the majority. See Norfolk & Western Rwy. Co. v. American Train Dispatchers' Ass'n, 499 U.S. 117, 129, 111 S.Ct. 1156, 113 L.Ed.2d 95 (1991) ("[W]hen a general term follows a specific one, the general term should be understood as a reference to subjects akin to the one with specific enumeration."); King v. St. Vincent's Hosp., 502 U.S. 215, 221, 112 S.Ct. 570, 116 L.Ed.2d 578 (1991) ("[T]he meaning of statutory language plain or not, depends on context."); Schreiber v. Burlington Northern, Inc., 472 U.S. 1, 8, 105 S.Ct. 2458, 86 L.Ed.2d 1 (1985) ("[W]ords grouped in a list should be given related meaning.").
 
 
 134
 Here, the anti-discrimination laws were specifically designed to eradicate discrimination in housing. See Alaska Stat. § 18.80.240; Anchorage Mun.Code § 5.20.020. To that end, the statutory language is explicitly aimed at communications disclosed during the rental of real property. There is absolutely no indication that the laws were intended or drafted to squelch religious or political expression. The laws in no way sanction or inhibit Thomas or Baker from speaking, writing, or publishing their views on cohabitation or their opinion of the anti-discrimination laws. Instead, just as Thomas & Baker may not use speech to discriminate on the basis of race or gender, Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations, 413 U.S. 376, 388, 93 S.Ct. 2553, 37 L.Ed.2d 669 (1973); Ragin v. New York Times Co., 923 F.2d 995 (2d Cir.1991), likewise under the Alaska and Anchorage laws they may not employ speech to discriminate on the basis of marital status. Thus, the most prudent and reasonable interpretation of these laws is that they restrict commercial speech and as such are subject to the four-part standard laid down in Central Hudson Gas and Electric Corp. v. Public Serv. Comm'n, 447 U.S. 557, 566, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980).
 
 V. Conclusion
 
 135
 The majority chooses the wrong set of facts to lead to an unprecedented and unnecessary result. In doing so, it addresses some of the murkiest areas of constitutional law. Its potential for harm will be seen when a landlord in this circuit refuses, on the basis of religious beliefs as honestly and firmly held as those of Thomas & Baker, to rent or sell housing to divorced individuals, interracial couples, victims of domestic abuse seeking shelter, or single men or women living together simply because they cannot afford to do otherwise, in spite of state and local laws forbidding such discrimination. Surely to say anything that would suggest such a proposition, we could wait for a case presenting a real controversy.
 
 
 
 [1]
 Joyce Baker's husband, Gary Baker, has elected not to participate in this appeal or to defend the final judgment that the district court entered in his favor
 
 
 [2]
 See, e.g., Genesis 2:24 ("For this reason a man will leave his father and mother and be united to his wife, and they will become one flesh."); 1 Thessalonians 4:3-4 ("It is God's will that you should be sanctified: that you should avoid sexual immorality; that each of you should learn to control his own body in a way that is holy and honorable, not in passionate lust like the heathen, who do not know God."); Hebrews 13:4 ("Marriage should be honored by all, and the marriage bed kept pure, for God will judge the adulterer and all the sexually immoral.")
 
 
 [3]
 See, e.g., John Calvin, Calvin's Commentaries: The Epistles of Paul to the Romans and to the Thessalonians 359 (David W. Torrance & Thomas F. Torrance, eds., Ross MacKenzie trans., 1960) ("There is nothing more opposed to holiness than the impurity of fornication, which corrupts the whole man.")
 
 
 [4]
 The Free Exercise Clause provides: "Congress shall make no law ... prohibiting the free exercise [of religion]." U.S. Const. amend. I. The Free Exercise Clause binds state governments by virtue of its incorporation into the Fourteenth Amendment. See Cantwell v. Connecticut, 310 U.S. 296, 303, 60 S.Ct. 900, 84 L.Ed. 1213 (1940)
 Thomas and Baker also alleged that enforcement of the state and local laws would run afoul of the Religious Freedom Restoration Act of 1993 ("RFRA"), 42 U.S.C. §§ 2000bb-2000bb-4. The district court found in favor of the landlords on the basis of RFRA as well as the First Amendment. However, subsequent to the entry of the district court's order, the Supreme Court declared RFRA unconstitutional. See City of Boerne v. Flores, 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997). Consequently, the arguments on appeal revolve exclusively around the Free Exercise Clause.
 
 
 [5]
 AERC having effectively conceded that the requirements for judicial notice are met, Thomas and Baker's Motion Requesting the Court to take Judicial Notice of the enforcement proceeding is GRANTED
 
 
 [6]
 Unlike the majority of other courts to address the issue, see, e.g., Ryan v. United States Dep't of Justice, 950 F.2d 458 (7th Cir.1991); Cornerstone Bible Church v. City of Hastings, 948 F.2d 464 (8th Cir.1991), this court originally construed Smith as applying only to neutral, generally applicable criminal laws. See American Friends Serv. Comm. v. Thornburgh, 961 F.2d 1405, 1407 (9th Cir.1991). Judge Fernandez expressed his disagreement with what he called this court's "crabbed view" of Smith and insisted that Smith 's holding should be understood as applying to all neutral, generally applicable laws, whether civil or criminal. See Goehring v. Brophy, 94 F.3d 1294, 1306 (9th Cir.1996) (Fernandez, J., concurring). Judge Fernandez's view appears to have prevailed in practice. Last Term, in City of Boerne v. Flores, 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997), the Supreme Court concluded that Congress had exceeded its authority under § 5 of the Fourteenth Amendment when it passed the Religious Freedom Restoration Act of 1993 ("RFRA"), 42 U.S.C. § 2000bb-2000bb-4. Boerne involved a local zoning ordinance--a civil regulation--that the Fifth Circuit had found invalid under RFRA. The Supreme Court held that RFRA was, in essence, an impermissible attempt to override legislatively its decision in Smith. Obviously, in order to invalidate RFRA on the basis that it did, the Court had to conclude that RFRA was in conflict with Smith. And in order for such a conflict to exist (at least in the context of the case before it), the Court had to conclude that Smith, like RFRA, applied to civil statutes and ordinances as well as criminal
 The civil-criminal distinction is not particularly relevant to the analysis of the Alaska statute's constitutionality because that statute makes violation of its terms a misdemeanor, punishable by fine or imprisonment. See Alaska Stat. § 18.80.270. The precise nature of the Anchorage ordinance is less certain. Section 5.30.070 does make it a misdemeanor to "willfully resist[ ], prevent[ ], impede[ ] or interfere[ ] with the equal rights commission or any of its authorized representatives," but it is not clear that the ordinance renders the very act of refusing to rent on the basis of marital status criminal. Thus, to the extent that the Anchorage ordinance is a purely civil statute, the Supreme Court's implicit determination in Boerne that Smith reaches civil, as well as criminal, laws is significant, and controls our analysis.
 
 
 [7]
 When we have discussed hybrid rights under Smith, we have sent mixed signals. See American Friends Serv. Comm. Corp. v. Thornburgh, 961 F.2d 1405, 1407 (9th Cir.1992). In American Friends, we initially characterized a hybrid claim as one "which contains not only a free exercise challenge to government action, but also another substantive constitutional claim as well." Id. at 1408 (emphasis added). Our suggestion that a hybrid-rights claim need only "contain[ ]" a non-free-exercise "challenge" would seem to imply that another right need only be pleaded alongside a free exercise claim. Other portions of the American Friends opinion, however, suggest an assumption that perhaps the existence of an independently viable companion right is a necessary prerequisite to a hybrid claim. For instance, in so concluding, the American Friends court observed that the challenge before it was not "based on any cognizable constitutional claim in addition to its free exercise claim; its claim is therefore not 'hybrid.' " Id. at 1409 (emphasis added)
 
 
 [8]
 Proponents and critics of the Smith decision alike have questioned the Court's attempted distinction of the so-called hybrid cases and the hybrid-rights doctrine to which the distinction gave rise. See William P. Marshall, In Defense of Smith and Free Exercise Revisionism, 58 U. Chi. L.Rev. 308, 309 (1991) ("Its use of precedent borders on fiction."); Michael W. McConnell, Free Exercise Revisionism and the Smith Decision, 57 U. Chi. L.Rev. 1109, 1122 (1990) ("[A] legal realist would tell us ... the Smith Court's notion of 'hybrid' claims was not intended to be taken seriously."). One commentator speculated regarding Smith 's hybrid-rights analysis thusly: "Justice Scalia had only five votes. He apparently believed he couldn't overrule anything, and so he didn't. He distinguished everything away instead." Douglas Laycock, Free Exercise and the Religious Freedom Restoration Act, 62 Fordham L.Rev. 883, 902 (1994). As an intermediate court of appeals charged with resolving a specific controversy, we lack the luxury that the ivory tower provides. Our job is not to critique or to deconstruct; ours is to make sense of a confusing doctrinal situation--to make the pieces fit
 
 
 [9]
 The Takings Clause provides: "[N]or shall private property be taken for public use, without just compensation." U.S. Const. amend. V. The Takings Clause applies to the States through the Fourteenth Amendment. See Chicago, Baltimore & Quincy R.R. Co. v. Chicago, 166 U.S. 226, 239, 17 S.Ct. 581, 41 L.Ed. 979 (1897)
 
 
 [10]
 The Court in Yee did not squarely address the regulatory-takings issue because it was not "fairly included in the question on which [the Court] granted certiorari." Yee, 503 U.S. at 533, 112 S.Ct. 1522
 
 
 [11]
 The Free Speech Clause provides: "Congress shall make no law ... abridging the freedom of speech...." The Free Speech Clause applies to the States through the Fourteenth Amendment. See Gitlow v. New York, 268 U.S. 652, 666, 45 S.Ct. 625, 69 L.Ed. 1138 (1925)
 
 
 [12]
 Even were we to assume that the Alaska laws did primarily target commercial speech, we would not review them under the deferential Central Hudson test normally applied to commercial-speech restrictions. See Central Hudson, 447 U.S. at 566, 100 S.Ct. 2343 (subjecting commercial speech restrictions to a form of intermediate scrutiny). The laws' plain language "does not limit the scope of regulated activity to purely commercial speech." S.O.C., Inc. v. County of Clark, 152 F.3d 1136, 1143 (9th Cir.1998). Rather, fully protected religious speech is also burdened. Hence, the laws are "overbroad" and, as such, subject to strict First Amendment scrutiny. See id. at 1142-44 (invalidating a law as overbroad because it neither limited its scope to "speech which does no more than propose a commercial transaction" nor provided an exception for speech that contained both commercial and expressive elements); see also Riley v. National Fed'n of the Blind, 487 U.S. 781, 796, 108 S.Ct. 2667, 101 L.Ed.2d 669 (1988) ("[E]ven assuming, without deciding, that such speech in the abstract is indeed merely 'commercial,' we do not believe that the speech retains its commercial character when it is inextricably intertwined with otherwise fully protected speech.")
 
 
 [13]
 The Supreme Court has, however, recognized that some purely financial burdens might be so severe as to rise to the level of constitutionally "substantial." See Jimmy Swaggart Ministries v. Board of Equalization, 493 U.S. 378, 392, 110 S.Ct. 688, 107 L.Ed.2d 796 (1990)
 
 
 [14]
 That is not to say that there might not be distinct sunk costs involved in cashing out
 
 
 [15]
 Of course, the Supreme Court has not maintained distinctions between married and unmarried persons in all contexts. See, e.g., Eisenstadt v. Baird, 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972) (holding unconstitutional a law that permitted married couples but prohibited unmarried couples from purchasing contraceptives). However, in the housing context--the most relevant context for our purposes--the Supreme Court has drawn and enforced such lines
 
 
 [16]
 "Familial status" is defined under the Act as relating to the domicile of children with adults
 
 
 [17]
 The Establishment Clause provides: "Congress shall make no law respecting an establishment of religion...." U.S. Const. amend. I. Although the Establishment Clause was originally understood as a guarantee to state governments that Congress would leave church-state relations to the individual States, the Supreme Court has long subscribed to the view that the Establishment Clause applies against the States through the Fourteenth Amendment. See Everson v. Board of Educ., 330 U.S. 1, 8, 67 S.Ct. 504, 91 L.Ed. 711 (1947)
 
 
 [1]
 The "event" is the filing of a citizen complaint by a student attending Alaska Pacific University, a private religious school, with the Alaska State Commission for Human Rights. Alaska State Comm'n for Human Rights, Paula M. Haley Exec. Dir., Ex. Rel. Kristiann Rutzler v. Alaska Pacific Univ., ASCHR No. C96010 (filed February 3, 1997)
 
 
 [2]
 See notes 3 & 4 infra and accompanying text
 
 
 [3]
 In American-Arab Anti-Discrimination Comm. v. Thornburgh, 970 F.2d 501, 507-08 (9th Cir.1992), this court found that the individual appellees faced a "real and immediate" threat of future injury from the challenged immigration law provisions. While the plaintiffs were not currently facing charges, they had once been charged with violating the provision. Id. at 508. The court noted that even if they had not been charged in the past, standing was proper because of evidence that the government was actively prosecuting under the provisions. Id. As discussed in the next paragraph, the history of past and present prosecutions in this case is lacking
 
 
 [4]
 In Bland, 88 F.3d at 729, this court found the plaintiff had standing even though the statute had yet to be enforced against anyone. Unlike the statute in Bland which was only six years old, the statute here was enacted over twenty-two years ago. Moreover, in Bland, the plaintiff's own actions supported his contention that the controversy was "immediate and real" so as to confer standing. Whereas the plaintiff in Bland complied with the law and immediately filed suit, Thomas and Baker sought judicial intervention after purporting to have violated the law for years. Thus, Thomas and Baker's own actions undermine the contention that they face a "realistic danger" of prosecution. Id. at 736. Therefore, it would seem imprudent and premature for this court to adjudicate what can be considered an "abstract disagreement." See Portman, 995 F.2d at 902
 
 
 [5]
 Virtually all those affected by the statute were plaintiffs in Eu. Thus, it was quite possible that the statute in question had never been violated
 
 
 [6]
 Assuming that Thomas & Baker have flagrantly violated the anti-discrimination laws for over a decade, it is also quite possible that other landlords have done the same and yet there has only been two enforcement actions in 22 years
 
 
 [7]
 The majority also relies on Adult Video Assoc. v. Barr, 960 F.2d 781 (9th Cir.1992), rev'd on other grounds, 509 U.S. 917, 113 S.Ct. 3028, 125 L.Ed.2d 716 (1993), opinion adopted in part, 41 F.3d 503 (9th Cir.1994), to conclude that non-enforcement of the anti-discrimination laws is not a barrier to justiciability. However, in Adult Video Assoc., the government actively enforced the RICO obscenity provision against similarly situated individuals and could enforce the pre-trial seizure provision at any time in any case
 
 
 [8]
 The notion that individual religious belief becomes the paramount law is precisely what the Supreme Court rejected in Employment Div., Dept. of Human Resources of Oregon v. Smith, 494 U.S. 872, 888, 890, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1989) (citations omitted):
 [I]f "compelling interest" really means what it says, many laws would not meet the test. Any society adopting such a system would be courting anarchy, but that danger increases in direct proportion to the society's diversity of religious beliefs, and its determination to coerce or suppress none of them. Precisely because we are a cosmopolitan nation made up of people of almost every conceivable religious preference, and precisely because we value and protect religious divergence, we cannot afford the luxury of deeming presumptively invalid, as applied to the religious objector, every regulation of conduct that does not protect an interest of the highest order. The rule respondents favor would open the prospect of constitutionally required religious exemptions from civic obligations of almost every conceivable kind ... [leaving] a system in which each conscience is a law unto itself.
 
 
 [9]
 These cases are Wisconsin v. Yoder, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972); Follett v. McCormick, 321 U.S. 573, 64 S.Ct. 717, 88 L.Ed. 938 (1944); Murdock v. Pennsylvania, 319 U.S. 105, 63 S.Ct. 870, 87 L.Ed. 1292 (1943); Cantwell v. Connecticut, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940); Pierce v. Society of Sisters, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925)
 
 
 [10]
 Follett, Murdock, and Cantwell can be explained on free speech grounds alone, while Yoder and Pierce can be interpreted as decided on substantive due process grounds
 
 
 [11]
 The record does tell us when Baker entered the residential landlord business. Without this fact, this court cannot assess Baker's standing. This is yet another reason why this case is not ripe for review
 
 
 [12]
 While the majority opinion outlines the three factors that govern a regulatory takings analysis, they do not rigorously apply it to the facts of this case. Instead, the majority opinion finds that Thomas and Baker have presented a colorable Fifth Amendment claim by relying entirely on a single sentence from the Supreme Court's dicta in Phillips v. Washington Legal Found., 524 U.S. 156, ----, 118 S.Ct. 1925, 1933, 141 L.Ed.2d 174 (1998)
 
 
 [13]
 In Andrus v. Allard, 444 U.S. 51, 100 S.Ct. 318, 62 L.Ed.2d 210 (1979), the Supreme Court held that a regulation banning the sale of protected bird parts did not constitute a taking. In reaching its decision, the Court noted that a reduction in the economic value of property was not the sole measure of a regulatory takings claim. Id. at 66, 100 S.Ct. 318. However, the Court stated that even when a regulation denies an owner one of the "sticks" traditionally found in his bundle of property rights, such as the right to sell, a takings claim does not necessarily lie. Id. at 66-67, 100 S.Ct. 318
 
 
 [14]
 In Discovery Network, the parties conceded that the speech at issue was commercial. See id. at 416, 113 S.Ct. 1505 ("[R]espondents do not challenge their characterization as commercial speech."). See also id. at 424, 113 S.Ct. 1505 ("[F]or the purposes of deciding this case, we assume that all of the speech barred ... is what we have labeled 'core' commercial speech.")